Ruth M. SAINT–PIERRE, Plaintiff and Appellant,

v.

Mark S. SAINT–PIERRE, Defendant and Appellee.

Nos. 14271, 14291.

Supreme Court of South Dakota.

Argued March 19, 1984.

Decided Oct. 3, 1984.

Rehearing Denied Nov. 13, 1984.

Ann C. Jones of Banks & Johnson, Rapid City, for plaintiff and appellant.

Roberta J. Earley, Belle Fourche, for defendant and appellee.

WOLLMAN, Justice.

The trial court entered judgment granting both parties a divorce on the ground of extreme mental cruelty. Plaintiff, Dr. Ruth M. Saint-Pierre, appeals from the judgment. In turn, defendant, Mark S. Saint-Pierre, has filed a notice of review with respect to certain provisions of that judgment. We affirm in part and reverse and remand in part.

We note that the trial that culminated in the judgment being appealed from consisted of some ten days of testimony, resulting in 1,726 pages of transcript.* Our task of summarizing the evidence introduced at this lengthy trial has been made easier by virtue of the trial court's memorandum decision, incorporated into the findings of fact and conclusions of law.

Plaintiff and defendant were married on November 20, 1971. At the time of trial, March 1983, they were both 32 years of age.

Two children were born to the marriage, a daughter, born January 25, 1974, and a son, was born September 23, 1975.

At the time of their marriage, the parties were college students. Following their graduation from college in May of 1972, defendant obtained employment with the Sioux Youth Development Association in Eagle Butte, South Dakota, in late summer of 1972. Plaintiff obtained employment in Eagle Butte as a teacher's aide. In the spring of 1973, defendant became employed with the Cheyenne River Sioux Tribe.

Plaintiff was accepted as a student in the University of South Dakota School of Medicine, and the parties moved to Vermillion in late summer of 1974. Defendant obtained employment with the University of South Dakota School of Education in September of 1974 at a salary of $11,500 per year. Defendant later worked at the Division of Allied Health and in the Indian Studies Program at a salary of $17,500 per year. He also wrote a book on Indian art and earned his master of arts degree during the time that plaintiff was earning her medical degree.

Plaintiff received a waiver of her tuition in return for her agreement that she would practice medicine in South Dakota. She also received student loans in the amount of $350 to $400 per month for other school expenses. Plaintiff graduated from medical school in June of 1978. The parties then moved from Vermillion to Yankton, where plaintiff completed her residency

training. Upon the completion of plaintiff's residency, the parties purchased some property in the Trojan community near Deadwood, where defendant commenced building a home while plaintiff began practicing medicine in Eagle Butte as a part of her three-year commitment to pay off her student loans. Although defendant made a desultory attempt to find employment in Eagle Butte, he soon became depressed and ceased his search for employment, whereupon plaintiff suggested that he return to their property at Trojan and work on their house, which he did. Plaintiff became frustrated with her practice in Eagle Butte and moved to the family home in Trojan, where she became associated in the practice of medicine with the Black Hills Medical Center in Deadwood.

The parties' marriage was a stormy one. The trial court found that both parties had inflicted extreme mental suffering upon the other. The record reveals that in December of 1982 defendant struck plaintiff in the eye with such force that she was required to seek medical attention.

The trial court awarded custody of the children to defendant and ordered plaintiff to pay $400 per month per child in the way of child support. The trial court divided the marital property and denied both parties' claims for alimony and attorney fees. The issues raised by plaintiff's appeal and defendant's notice of review cover the areas of child custody, valuation and division of property, the amount of child support, and the denial of defendant's claim for attorney fees and alimony.

## CHILD CUSTODY

Plaintiff contends that the trial court abused its discretion in awarding custody of the two minor children to defendant. The trial court found the custody question to be a most troublesome issue in view of the testimony to the effect that both parties have rather volatile personalities and appear to be somewhat self-centered individuals. The trial court had the benefit of

* Plaintiff's counsel on appeal did not represent her at trial.

a home study report prepared by the South Dakota Department of Social Services. This report recommended that custody of the children be awarded to plaintiff. The trial court also had before it a report from Dr. James Hess, a Spearfish, South Dakota, psychologist who had interviewed the children and who had administered psychological tests to the children and to defendant. In Dr. Hess' opinion, defendant has a healthy, loving relationship with his children. The report stated that the children had expressed to Dr. Hess a desire to live with defendant and appeared to have a very positive relationship with defendant.

In addition to considering the report from the Department of Social Services, the court had the benefit of the in-court sworn testimony of most of the persons who had been interviewed by the Department's social workers.

Notwithstanding its concern over defendant's behavior towards plaintiff in the presence of the children during the months immediately prior to trial, as well as the concern generated by defendant's demeanor during the course of the divorce trial, the trial court found that it would be in the best interests of the children that they be placed in the custody of defendant, subject to liberal visitation rights in plaintiff. The court further found that the best interests of the children would be served by the court's reviewing the custody arrangement one year from the date of entry of judgment. Accordingly, the decree of divorce provides in part that

> Defendant is awarded the temporary care, custody and control of the minor children of the marriage for a period of one year, at which time the Court shall review the custody of the children upon application of either party.

█ Before considering the merits of the custody decision, we must dispose of defendant's contention that because the custody order is temporary in nature, it could be appealed only in accordance with SDCL 15–26A–13, a procedure that plaintiff did not follow. We do not agree. Granted that the custody provision of the divorce decree is unusual insofar as the trial court indicated its willingness to review the matter of custody after the period of one year upon the application of either party, SDCL 25–4–45 provides that in divorce actions the trial court may at any time after judgment vacate or modify its order granting custody over the children of the marriage. In a technical sense, then, all custody orders are temporary inasmuch as they are always subject to being modified, subject, of course, to the prerequisite showing of a substantial and material change in circumstances. *See, e.g., Sneesby v. Davis*, 308 N.W.2d 565 (S.D.1981); *Engels v. Engels*, 297 N.W.2d 489 (S.D. 1980); *Menning v. Menning*, 272 N.W.2d 828 (S.D.1978); *Masek v. Masek*, 90 S.D. 1, 237 N.W.2d 432 (1976). Though temporary in this sense, custody orders do not lapse or become ineffective merely by the passage of time. As we read it, the custody award provision of the divorce decree before us does nothing more than spell out the trial court's amenability to a review of custody after the expiration of one year. Accordingly, we conclude that the custody award falls within the classification of those judgments and orders that are appealable as a matter of right under the provisions of SDCL 15–26A–3(4). In any event, on an appeal from a judgment, we may review any determination by the trial court. SDCL 15–26A–7.

█ Turning, then, to the merits of the custody award, we apply the well-settled rules of appellate review to the effect that the trial court has broad discretion in awarding custody of minor children, and that the trial court's decision regarding custody will be reversed on appeal only upon a clear showing of an abuse of that discretion. *See, e.g., Wolff v. Wolff*, 349 N.W.2d 656 (S.D.1984); *Watt v. Watt*, 312 N.W.2d 707 (S.D.1981); *Engels v. Engels, supra; Haskell v. Haskell*, 279 N.W.2d 903 (S.D.1979); *Spaulding v. Spaulding*, 278 N.W.2d 639 (S.D.1979).

The paramount consideration in deciding the issue of child custody is the best interests of the child. SDCL 30–27–19; *Wolff v.*

*Wolff, supra; Haak v. Haak,* 323 N.W.2d 128 (S.D.1982); *Watt v. Watt, supra.*

■ After viewing the voluminous record in the light of the foregoing principles of appellate review, we cannot say that the trial court's findings of fact that resulted in an award of custody of the children to defendant are clearly erroneous. *In re Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970). Without belaboring the evidence, we agree with the trial court's observation that there is considerable testimony in the record to the effect that defendant was more involved than plaintiff with the day-to-day parenting duties during the years when plaintiff was a medical student, as he has been during the time that plaintiff has been engaged in the practice of medicine. Likewise, not surprisingly there is testimony that plaintiff's professional obligations limit the time she has available to be with the children. There is evidence these obligations cause plaintiff considerable stress. Moreover, the evidence supports the trial court's finding that defendant better meets the emotional needs of the children, while plaintiff better satisfies their basic physical needs.

It quite clearly appears from the record that both parties are highly intelligent, highly motivated, highly goal-oriented, and somewhat high-strung and temperamental individuals. It would serve no useful purpose to set forth in clinical detail the various clashes, both physical and emotional, between the parties that culminated in plaintiff's bringing this action for divorce. Suffice it to say that we cannot say that the trial court clearly abused its discretion in awarding custody of the two minor children to defendant.

In reaching this conclusion, we wish to make crystal clear that we are in no way intimating that a woman who pursues a separate career, whether it be in medicine, law, education, business, or any other vocation, forfeits her right to the custody of her minor children. Indeed, had the trial court in the instant case concluded, based upon its observation of the demeanor of the parties as well as that of the other witnesses

who testified in this proceeding, that custody should be awarded to plaintiff, we would have been hard-pressed to say that that decision represented a clear abuse of discretion. Based as it was, however, upon the court's first-hand opportunity to gauge the credibility and the emotional stability of the parties as reflected by their testimony and demeanor during the lengthy trial, the trial court's decision must be given the appropriate deference mandated under our scope of appellate review. Accordingly, we affirm this portion of the judgment.

## PROPERTY DIVISION

After leaving Eagle Butte and moving to the family home at Trojan, plaintiff became associated in August of 1982 with Black Hills Medical Center (the Medical Center), a professional medical corporation in Deadwood, by purchasing for $150 five shares of stock in the Medical Center pursuant to a buy/sell agreement that requires her to sell the shares back to the Medical Center for the amount of the purchase price upon the occurrence of a termination event, as defined in the agreement. Plaintiff has incorporated her practice as "Ruth M. Saint-Pierre, M.D., P.C." which is the entity that receives plaintiff's share of the Medical Center's distributable income.

Much testimony, some of which was confusing, was offered regarding the value of plaintiff's individual medical corporation and the value of her interest in the Medical Center. The trial court found that notwithstanding the value of plaintiff's shares in the Medical Center as specified in the buy/sell agreement, plaintiff's individual professional corporation had a value of $55,000. The trial court found that plaintiff's interest in the Medical Center had a value of $1,000.

Plaintiff contends that the finding that her professional corporation has a value of $55,000 is clearly erroneous, while defendant contends that the trial court erred in failing to include good will as a component of valuation when arriving at the value of plaintiff's individual professional corpora-

tion. Except as noted below, we conclude that neither contention is well taken.

■ There was evidence from which the trial court could properly find that plaintiff's earned share of the Medical Center's undisbursed income, which is distributed to the six doctor-shareholders every three months, together with plaintiff's individual accounts receivable had a value of $55,000. *See Stern v. Stern,* 66 N.J. 340, 331 A.2d 257 (1975). The trial court did apparently fail to take into account, however, some $12,000 that plaintiff acknowledged was held in her professional corporation's bank account at the time of trial. On remand, the trial court should make whatever adjustment, if any, that is necessary to correct this oversight. *Guindon v. Guindon,* 256 N.W.2d 894 (S.D.1977).

■ The trial court did not err in refusing to place a value on the good will component of plaintiff's individual professional corporation. Under the terms of the buy/sell agreement, plaintiff is restricted to selling her shares back to the Medical Center. Apart from her interest in the Medical Center, plaintiff has no history of private medical practice that could be valued in terms of good will, assuming that that is a valid component of valuation in a professional corporation. *Cf. Fait v. Fait,* 345 N.W.2d 872 (S.D.1984). *See, e.g., In re Marriage of Fenton,* 134 Cal.App.3d 451, 184 Cal.Rptr. 597 (1982); *In re Marriage of Nichols,* 43 Colo.App. 383, 606 P.2d 1314 (1980); *In re Marriage of White,* 98 Ill. App.3d 380, 53 Ill.Dec. 786, 424 N.E.2d 421 (1981); *Stern v. Stern, supra,* 331 A.2d at 261, n. 5; *In re Marriage of Fleege,* 91 Wash.2d 324, 588 P.2d 1136 (1979). *But see Nail v. Nail,* 486 S.W.2d 761 (Tex.1972).

Turning to the remainder of the valuation and division of property, the trial court found that at the time of their marriage the parties owned no significant assets other than their personal belongings and modest savings. Both parties contributed to the accumulation of the marital property. As indicated above, defendant earned as much as $17,500 annually while working at the University of South Dakota. Since moving to their home at Trojan, defendant has operated the Northern Lights Art Gallery in Deadwood. During 1982 he helped develop the Sundance Mountain Ski Resort in Wyoming. Neither of these businesses is yet profitable. As a practicing physician, plaintiff's income is much higher than defendant's. In 1982 her professional corporation received $62,903.58 as her distributable share of the Medical Center's income, and for the period January-February 1983, $37,824.83. Plaintiff testified that she anticipated receiving as much as $120,000 as her share of the medical corporation's distributable income in 1983. The accountant for the Medical Center testified that plaintiff's 1983 income should be between $160,000 and $165,000.

The parties' residence consists of a custom log home situated on twelve acres in the Trojan area of rural Lawrence County. The parties also own an eighteen acre tract of unimproved land. The parties also own real estate in Deadwood, which houses the Northern Lights Art Gallery and a rental apartment.

The court ordered a third party to conduct an inventory and appraisement of the parties' personal property located in the residence, the art gallery, and in plaintiff's medical office. This inventory and appraisement, which runs to some 56 pages, lists the parties' personal property in exhaustive detail.

The trial court divided the property as follows:

Plaintiff

| Assets | | Liabilities | |
|---|---|---|---|
| Family residence (12 acres) | $ 70,000.00 | 1st Federal home mortgage | $ 46,500.00 |
| Medical practice (includes 6 shares BHMC and accounts receivable) | 55,000.00 | Education loans | 45,000.00 |
| | | Note to Miners & Merchants (rug) | 2,000.00 |

Plaintiff

| Assets | | Liabilities | |
|---|---|---|---|
| Partnership interest Northern Hills Medical Association | $ 1,000.00 | Visa | $ 1,000.00 |
| | | Note to St. Joseph Hospital | 5,000.00 |
| Personal property at medical office | 2,610.50 | Aldenvilla credit union | 900.00 |
| Clock at repair shop | 500.00 | | |
| Personal property (residence) (70%) | 57,399.23 | | |
| | | | $100,400.00 |
| | $186,509.73 | Net Share | $ 86,109.73 |

Defendant

| Assets | | Liabilities | |
|---|---|---|---|
| 18 acres Trojan area | $ 42,500.00 | Contract for deed (31 Charles) | $ 30,700.00 |
| Real estate 31 Charles (gallery) | 45,000.00 | Mortgage on 18 acres and gallery property (M&M Bank) | 18,000.00 |
| Gallery (fixtures & inventory) | 10,600.00 | | |
| Partnership interest Sundance Mt. | 5,000.00 | Business debts gallery | 9,300.00 |
| Ford tractor, van, 2 wheel trailer, motorcycles and other personal property at ski area | 2,500.00 | | |
| '79 Jeep Cherokee | 2,500.00 | | |
| Personal property at gallery | 23,556.00 | | |
| Personal property (residence) (30%) | 24,599.67 | | |
| | | | $ 58,000.00 |
| | $156,255.67 | Net Share | $ 98,255.67 |

As a part of the division, the trial court ordered that defendant should have his choice of items from the residence to the extent of thirty percent of the total, with the balance to be retained by plaintiff.

Both parties attack the property division as constituting an abuse of discretion on the part of the trial judge. Plaintiff contends that the trial court erred in giving defendant first choice of the personal property items in the family residence. Defendant contends that the trial court erred in failing to award him the marital home, in failing to exclude from the valuation of the marital property some $5,400 worth of personal property that the parties had stipulated should be set aside to the children, and in failing to set aside to defendant some $8,000 worth of family heirlooms which defendant and his brother had inherited from defendant's grandfather. He also contends that the trial court erred in including the value of certain personal property twice in arriving at the value of certain fixtures and inventory of the Northern Lights Art Gallery.

■ Trial courts have full power to make an equitable division of the property belonging to the parties to a divorce action, and in making such division of the property they shall have regard for equity and the circumstances of the parties. SDCL 25–4–44. In making a division of property in a divorce action, the trial court is bound by no mathematical formula. *See, e.g., Booth v. Booth,* 354 N.W.2d 924 (S.D.1984); *Owen v. Owen,* 351 N.W.2d 139 (S.D.1984); *Wolff v. Wolff, supra; Kressly v. Kressly,* 77 S.D. 143, 87 N.W.2d 601 (1958). The trial

court must take into consideration the duration of the marriage, the value of the property owned by the parties, the ages of the parties, the health of the parties, the competency of the parties to earn a living, the contribution of each party to the accumulation of the property, and the income-producing capacity of the property owned by the parties. *See, e.g., Booth v. Booth, supra, Owen v. Owen, supra; Wolff v. Wolff, supra; Watt v. Watt, supra; Hansen v. Hansen,* 273 N.W.2d 749 (S.D.1979).

■ The trial court has broad discretion in dividing property, and a division of property will not be set aside or modified on appeal unless it clearly appears that the trial court abused its discretion. *Id.*

The record reveals that the trial court took each of the above-cited factors into consideration in arriving at its division of the marital property. As indicated above, the parties are of the same age. The trial court found that their health was generally good. Both parties have the skills and training necessary to earn a living, plaintiff, of course, having by far the greater earning capacity. In the light of contemporary statistics, the parties' marriage was a fairly lengthy one. Both parties contributed to the accumulation of the marital property. The property awarded to plaintiff is not of an income-producing nature, while that awarded to defendant has the potential for becoming profitable.

■ We conclude that the trial court did not err in failing to award the marital home to defendant. It is true that our trial courts have broad authority to award possession of the marital home to the custodial parent. *See Johnson v. Lowary,* 81 S.D. 202, 132 N.W.2d 823 (1965); *Stearns v. Stearns,* 80 S.D. 443, 126 N.W.2d 124 (1964). This does not mean, however, that possession of the marital home must necessarily be awarded to the custodial parent. As a part of the division of the marital property, the trial court as a practical matter was required to award the art gallery and the ski resort property to defendant, given plaintiff's preoccupation with her medical practice. An award to plaintiff of

the marital home was necessary in order to bring the property division into anything approaching an equitable balance. Accordingly, we cannot say that the trial court ignored the best interests of the children or abused its discretion in awarding the home to plaintiff.

■ With respect to his contention that the trial court erred in failing to set aside certain personal property which the parties had stipulated was to be given to the children and in including certain property in the Northern Lights Art Gallery twice in the valuation of property, we note that defendant's objections to plaintiff's proposed findings of fact and his own proposed findings of fact did not clearly bring these alleged errors to the attention of the trial court. In the usual case, therefore, defendant would be precluded from urging these matters on appeal. *See Burke v. Lead-Deadwood Sch. Dist. #40–1,* 347 N.W.2d 343 (S.D.1984). In view of the fact, however, that we are reversing the judgment in part so that the trial court may take into account the $12,000 held by plaintiff's professional corporation, we will also reverse the judgment to the extent that the trial court apparently failed to carry out the stipulated intention of the parties with respect to the property to be given to the children and in apparently counting certain items of property twice in arriving at the total value of the personal property.

■ Turning to defendant's contention that the trial court erred in not setting aside certain inherited family heirlooms, as we recently pointed out in *Booth v. Booth, supra,* although the trial court is to consider the fact that one of the parties inherited certain property, it is not bound to set such property aside to that party and may consider it as part of the property to be divided. *See also Laird v. Laird,* 322 N.W.2d 254 (S.D.1982); *Balvin v. Balvin,* 301 N.W.2d 678 (S.D.1981); *Buseman v. Buseman,* 299 N.W.2d 807 (S.D.1980); *Clement v. Clement,* 292 N.W.2d 799 (S.D. 1980).

We have considered defendant's remaining challenges to the property division award and conclude that they are without merit, as is plaintiff's contention that the trial court erred in giving defendant first choice of thirty percent of the property in the family home.

## CHILD SUPPORT

Plaintiff contends that the amount of child support that she has been ordered to pay is excessive in view of defendant's ability to support the minor children. She points to SDCL 25-7-7, which makes the parents of a child jointly and severally obligated to provide the necessary maintenance, education, and support of the child in accordance with their respective means.

We will not disturb a child support award on appeal unless it appears that the trial court clearly abused its discretion in the award. *See, e.g., Gross v. Gross,* 355 N.W.2d 4 (S.D.1984); *Rykhus v. Rykhus,* 319 N.W.2d 167 (S.D.1982). "The amount of child support depends on the reasonable expenditures suitable to the children's circumstances at the time of divorce and the payor's financial means and ability to pay." *Barrett v. Barrett,* 308 N.W.2d 884, 885 (S.D.1981); *Gross v. Gross, supra; Rykhus v. Rykhus, supra; Wallahan v. Wallahan,* 284 N.W.2d 21 (S.D.1979).

After reviewing the record in the light of these principles, we are satisfied that the trial court did not clearly abuse its discretion in ordering plaintiff to pay $400 per month per child in the way of child support. In addition to having the duties attendant upon being the primary custodian of the children, defendant has the task of either liquidating the two money-losing business enterprises or devoting such time to them as necessary to make them profitable. On the other hand, plaintiff has a demonstrated ability to earn a substantial income from her medical practice. Although the children are still relatively young, they no doubt have grown accustomed to the standard of living that plaintiff's income has provided in the past. *Wallahan v. Wallahan, supra.* Accord-

ingly, we will not set aside the child support provisions of the judgment.

## DEFENDANT'S CLAIM FOR ALIMONY AND/OR LUMP SUM COMPENSATION

Defendant contends that because he gave up his career in order to move to Vermillion so that plaintiff could attend medical school and because he made a substantial contribution to plaintiff's attainment of her medical degree and attendant increase in future earning capacity, he should be compensated for his contributions by being awarded the family home, or, in the alternative, being awarded alimony in such an amount and for such period of time as necessary to enable him to attain competency to earn at a level equivalent to that which he would have had had he not sacrificed his career to support plaintiff in her career pursuits.

As defendant correctly observes, most courts have refused to classify a professional degree as an asset for the purposes of property division in a divorce action. *See, e.g., Wisner v. Wisner,* 129 Ariz. 333, 631 P.2d 115 (1981); *In re Marriage of Graham,* 194 Colo. 429, 574 P.2d 75 (1978); *In re Marriage of Goldstein,* 97 Ill.App.3d 1023, 53 Ill.Dec. 397, 423 N.E.2d 1201 (1981); *Inman v. Inman,* 648 S.W.2d 847 (Ky.1982); *Mahoney v. Mahoney,* 91 N.J. 488, 453 A.2d 527 (1982); *Frausto v. Frausto,* 611 S.W.2d 656 (Tex.Civ.App. 1981); *Grosskopf v. Grosskopf,* 677 P.2d 814 (Wyo.1984); Annot., 4 A.L.R.4th 1294 (1981).

As we did in *Wehrkamp v. Wehrkamp,* 357 N.W.2d 264, (S.D.1984), we agree with those holdings. As the Supreme Court of Colorado stated in holding that an educational degree is not property,

It does not have an exchange value or any objective transferable value on an open market. It is personal to the holder. It terminates on death of the holder and is not inheritable. It cannot be assigned, sold, transferred, conveyed, or pledged. An advanced degree is a cumulative product of many years of previous

education, combined with diligence and hard work. It may not be acquired by the mere expenditure of money. It is simply an intellectual achievement that may potentially assist in the future acquisition of property. In our view, it has none of the attributes of property in the usual sense of that term.

*In re Marriage of Graham, supra,* 574 P.2d at 77.

Likewise, the Supreme Court of New Jersey, in holding that a professional license or degree is not property to be valued in a divorce action, stated:

A professional license or degree is a personal achievement of the holder. It cannot be sold and its value cannot readily be determined. A professional license or degree represents the opportunity to obtain an amount of money only upon the occurrence of highly uncertain future events. . . .

Equitable distribution of a professional degree would similarly require distribution of "earning capacity"—income that the degree holder might never acquire. The amount of future earnings would be entirely speculative. Moreover, any assets resulting from income for professional services would be property acquired *after* the marriage; the statute restricts equitable distribution to property acquired *during* the marriage. . . .

Valuing a professional degree in the hands of any particular individual at the start of his or her career would involve a gamut of calculations that reduces to little more than guesswork. . . .

Even if such estimates could be made, however, there would remain a world of unforeseen events that could affect the earning potential—not to mention the actual earnings—of any particular degree holder.

*Mahoney v. Mahoney, supra,* 91 N.J. at 496–97, 453 A.2d at 531–32 (emphasis in original).

■ Having concluded that plaintiff's medical degree does not constitute property that is subject to division in a divorce action, we turn to the question whether there is an alternative method by which defendant might be compensated for his contributions to plaintiff's professional training and the enhanced earning capacity flowing therefrom.

In recent years a number of courts have been called upon to deal with the ever more common situation in which a marriage terminates in divorce after the spouse of one of the parties has helped to finance his or her spouse's professional education. As the Supreme Court of Wisconsin has recently stated,

The problem this case poses is not uncommon. University degree-divorce decree cases are frequent. In many marriages, while one spouse pursues an undergraduate, graduate, or professional degree or license, the other works to support the couple and foregoes his or her own education or career and the immediate benefits of a second income which the student spouse might have provided. The couple typically expects that the degree will afford them a higher shared standard of living in the future. That standard of living is never realized by the supporting spouse when the marriage breaks up just as the newly educated spouse is beginning the long-awaited career. In addition, little marital property has accumulated, because the couple's income was used for education and living expenses.

*Haugan v. Haugan,* 117 Wis.2d 200, 206, 343 N.W.2d 796, 800 (1984) (footnote omitted). (For a comprehensive citation of cases and authorities on this point, *see* n. 3 at 343 N.W.2d 799.)

When faced with such a situation, the courts have responded with various solutions. In *DeLa Rosa v. DeLa Rosa,* 309 N.W.2d 755 (Minn.1981), the Supreme Court of Minnesota affirmed the trial court's award of some $29,000 to a wife who had worked full-time and supported the parties while her husband completed his pre-medical studies and the first year of medical school prior to their divorce. The court noted that the trial court's award, which was ordered paid on an installment

basis in increasing amounts, was grounded in equitable principles and represented restitution of the financial support that the wife had provided to her husband.

In *Mahoney v. Mahoney, supra,* the Supreme Court of New Jersey adopted the concept of reimbursement alimony.

The concept properly accords with the Court's belief that regardless of the appropriateness of permanent alimony or the presence or absence of marital property to be equitably distributed, there will be circumstances where a supporting spouse should be reimbursed for the financial contributions he or she made to the spouse's successful professional training. Such reimbursement alimony should cover *all* financial contributions towards the former spouse's education, including household expenses, educational costs, school travel expenses and any other contributions used by the supported spouse in obtaining his or her degree or license.

91 N.J. at 501, 453 A.2d at 534 (emphasis in original).

In *In re Marriage of Graham, supra,* the Supreme Court of Colorado held that

[a] spouse who provides financial support while the other spouse acquires an education is not without a remedy. Where there is marital property to be divided, such contribution to the education of the other spouse may be taken into consideration by the court. *Greer v. Greer, supra* [32 Colo.App. 196, 510 P.2d 905 (1973)]. *See also Carlson v. Carlson,* 178 Colo. 283, 497 P.2d 1006 [1972]. Here, we again note that no marital property had been accumulated by the parties. Further, if maintenance is sought and a need is demonstrated, the trial court may make an award based on all relevant factors. Section 14–10–114(2). Certainly, among the relevant factors to be considered is the contribution of the spouse seeking maintenance to the education of the other spouse from whom the maintenance is sought.

194 Colo. at 433, 574 P.2d at 78.

In *In re Marriage of Lundberg,* 107 Wis.2d 1, 318 N.W.2d 918 (1982) the Supreme Court of Wisconsin, in applying a relatively recent amendment to that state's divorce statutes, held that the supporting spouse was entitled to be fairly compensated for the contribution to the support of the student spouse, the trial court to examine all of the relevant circumstances of the particular case.

■ Reimbursement or restitutionary alimony will not always be appropriate or necessary. In some cases an award of what the New Jersey Supreme Court has termed "rehabilitative alimony" may be more appropriate. This is especially true in a case in which the contributing supporting spouse requires a lump sum or a short-term award to achieve economic self-sufficiency or to improve or refresh his or her job skills. *See Mahoney v. Mahoney, supra. See also Bussell v. Bussell,* 623 P.2d 1221 (Alaska 1981).

In *Booth v. Booth, supra,* we recognized the concept of rehabilitative alimony and held that the trial court did not abuse its discretion in awarding the wife $600 per month alimony for a period of fifteen months to aid her in updating her job skills.

In *Wallahan v. Wallahan, supra,* we in effect adopted and approved the concept of reimbursement and rehabilitative alimony in affirming an award of $700 per month alimony. In holding that this award did not constitute an abuse of discretion, we wrote:

The record is replete with evidence that plaintiff made substantial contributions as a homemaker and mother during the couple's twenty-two years of marriage, that she gave up her career as a nurse to raise the children, that her earnings during the early years of their marriage were dedicated to putting defendant through college and law school, that she has not practiced her profession for fifteen years, and that she provided moral support and encouragement to defendant during the twenty-two years that the parties' assets were accumulated. Taken together, these facts support and justify

the trial court's division of property and award of alimony .... The court properly considered the fact that plaintiff is removed from her profession by fifteen years and still has obligations with regard to raising her children. Although evidence was presented to the effect that nursing positions are available in Rapid City, the trial court could properly balance job availability against plaintiff's long absence from the labor market and her family responsibilities.

284 N.W.2d at 26–27.

In accord with our holdings in *Booth* and *Wallahan, supra,* as well as on the basis of the other authorities cited above, we hold that in a proper case the trial court should award alimony as reimbursement to the supporting spouse for his or her contribution to the non-working spouse's obtaining of an advanced training or in the way of rehabilitative alimony to enable the supporting spouse to refresh or enhance the job skills that he or she needs to earn a living. We do not propose that the trial court be bound by any specific formula or approach in determining the amount of such alimony. *Cf. DeLa Rosa v. DeLa Rosa, supra; In re Marriage of Lundberg, supra; Mahoney v. Mahoney, supra.* Just as the trial court is not bound by any mathematical formula in dividing marital property, neither should the trial court be bound by a rigid, inflexible formula in awarding reimbursement or rehabilitative alimony. Rather, the trial court should consider all relevant factors, including the amount of the supporting spouse's contributions, his or her foregone opportunities to enhance or improve professional or vocational skills, and the duration of the marriage following completion of the non-supporting spouse's professional education. *See Mahoney v. Mahoney, supra,* 453 A.2d at 534, and n. 5 at 535.

We conclude that the trial court did not err in refusing to award defendant either a lump sum reimbursement by way of transfer of the marital home or in the way of reimbursement alimony. Contrary to his contention, defendant did not forego any career plans or advancement as a result of moving to Vermillion in order to be with plaintiff during her medical education. Indeed, as pointed out above, defendant secured employment with the University of South Dakota. At the same time, he was able to complete a book on Indian art and to obtain his master of arts degree in school administration. This is hardly the type of personal sacrifice and self-deprivation that is characteristic of so many cases in which one's spouse contributes to the professional education of his or her partner. Moreover, plaintiff incurred financial obligations of her own in financing her medical school education. As indicated above, she secured a waiver of tuition by agreeing to practice medicine in the state. Moreover, she incurred student loans that have left her with an outstanding loan balance of $45,000 to repay. As with the award of alimony in any case, *see, e.g., Guindon v. Guindon, supra,* the decision whether to award reimbursement or rehabilitative alimony, and, if so, in what amount and for what length of time, is committed to the sound discretion of the trial court. After considering all of the relevant factors in the case before us, we cannot say that the trial court abused its discretion in denying defendant's request for alimony.

### DENIAL OF ATTORNEY FEES AND COSTS

The final issue for our consideration is defendant's claim that the trial court abused its discretion in denying his request for attorney fees and costs. We conclude that this argument is not well taken.

SDCL 15–17–7 provides that in cases of divorce the trial court shall have the power to order payment of attorney fees where the allowance of the same seems warranted and necessary to the court. As we have held many times, the allowance of attorney fees in a divorce action is a matter which rests within the sound discretion of the trial court. *See, e.g., Ver Meer v. Ver Meer,* 90 S.D. 351, 241

N.W.2d 571 (1976) and *Jameson v. Jameson*, 90 S.D. 179, 239 N.W.2d 5 (1976).

In *Wallahan v. Wallahan, supra,* we said that

[i]n determining the portion that should be paid by the husband, the trial court should consider the property owned by each party, their relative incomes, whether the wife's property is in liquid or fixed assets, whether the actions of the wife or of the husband unreasonably increased the time spent on the case.

284 N.W.2d at 28.

We conclude that the trial court acted well within its discretion in denying defendant's request for attorney fees and costs.

CONCLUSION

To the extent that it fails to take into account the $12,000 bank account balance held by plaintiff's professional corporation at the time of trial, includes personal property that the parties had stipulated should be set aside to their children, and includes certain property twice in the valuation of the personal property located in the Northern Hills Art Gallery, the judgment is reversed, and the case is remanded to the circuit court with directions to make whatever adjustments may be necessary to correct these errors. In all other respects, the judgment is affirmed.

FOSHEIM, C.J., MORGAN, J., and DUNN, Retired Justice, concur.

HENDERSON, J., concurs specially.

DUNN, Retired Justice, participating.

WUEST, Circuit Judge, Acting as Supreme Court Justice, not participating.

HENDERSON, Justice (specially concurring).

I am of the belief that a timely concurring opinion may suffice to check an extension of any court's holding or a newly announced doctrine, and thereby better serve our jurisprudence. A concurring opinion can be of value by sounding a warning that a new holding or doctrine must not be pressed too far. As students of the law, we often see a majority opinion announce a new holding or doctrine which is jurisprudentially sound when applied to the facts before the court, but if given a general application, would be wholly unsound. Concurring opinions, without negatively detracting from the majority opinion can shed light on a majority opinion and permit the student of the law, and the Bar, a greater insight into the scope and breadth of the decision. A different viewpoint arises from different reasoning and often an author of a special writing can agree with the decision, holding, or doctrine, but cannot subscribe to the language embracing the decision. Down the road, in appellate time, an appellate justice discovers himself in an uncomfortable position if he has embraced the language of a decision to which he does not fully subscribe. Thus, I specially concur herein.

In *Wehrkamp v. Wehrkamp,* 357 N.W.2d 264 (S.D.1984), we essentially held that a college degree is not "property" to be divided nor is the potential earning capacity stemming therefrom distributable property. We left the door open for rehabilitative alimony, but said that it did not fit the facts.

I concur with the entirety of this decision but cannot accept the language of that aspect of the opinion denominated under "DEFENDANT'S CLAIM FOR ALIMONY AND/OR LUMP SUM COMPENSATION." I am fearful, as I prefaced above, that this aspect of the opinion widens the door to such extent that a college degree becomes susceptible to a distribution of sorts—as property. I note that, conceptually, courts have adjudicated upon lump sum compensation, reimbursement alimony, restitution alimony, and rehabilitative alimony. To me, rehabilitative alimony is an award of a monthly sum of money to rehabilitate a deserving spouse so that he or she may obtain the skills necessary to fend for himself or herself in life, by education or job training. Once lump sum compensation, alimony by reimbursement, or alimony by restitution is created by a trial court, it is recognition of a college degree as distribu-

table property—it is accomplishing indirectly that which the court does not wish to directly accomplish. I would restrict the holding to rehabilitative alimony and would not permit the other concepts to come into play in meting out the equities.