1999 SD 26

**Estate of Donald C. REGENNITTER, Deceased.**

No. 20449.

Supreme Court of South Dakota.

Considered on Briefs Jan. 12, 1999.

Decided Feb. 24, 1999.

Albert Steven Fox of Larson, Sundall, Larson, Schaub and Fox, Chamberlain, South Dakota, for appellant Estate of Regennitter.

Anita L. Fuoss, Murdo, South Dakota, for appellee Darlene Hatheway.

KONENKAMP, Justice.

[¶ 1.] A woman who was paid to attend to her friend's personal and business needs while he was ill, claimed additional amounts after his death. The estate denied the claim insisting that what she was paid during the decedent's life was in complete fulfillment of their agreement. Based on statements attributed to the decedent and the surrounding circumstances, the trial court found an implied contract existed for an additional amount. We conclude the evidence was sufficient to support the court's award and affirm.

## Facts

[¶ 2.] For many years, Donald Regennitter and Darlene Hatheway had been friends in Murdo, South Dakota. Each owned their own farmland, but in 1978 they formed a business partnership to jointly manage their agricultural operations. As originally contemplated, Hatheway was to provide the equipment and Regennitter the labor. Over time they carried out many farming ventures.

[¶ 3.] In 1990, Regennitter required special care after he burned his foot. Hatheway took him into her home and looked after him for six months. In November 1991, he suffered a stroke, leaving him partially paralyzed. Although mentally alert, he was unable to write. He gave Hatheway a power of attorney to conduct his day-to-day transactions. She was authorized to write checks and sign documents for him. The power of attorney was never rescinded.

[¶ 4.] Needing closer medical attention, Regennitter moved to a nursing home, but shortly learned he could not afford it. With no other facility available within his means, he and Hatheway agreed that he would again

move into her home, where she would care for him .[1] For this service, he paid her an amount equal to his social security check, between $567 and $578 a month. Eventually, his physical condition so deteriorated that he needed full time assistance. He was unable to perform even basic bodily functions without aid. And as part of his rehabilitation from the stroke, he required regular physical therapy and exercise. Hatheway dutifully attended to all these needs.

[¶ 5.] With her increased commitment, Hatheway sought more compensation. She discussed the matter with Charles Kell, Regennitter's attorney. Kell suggested that she charge $800 per month. When Hatheway approached Regennitter with the proposed new terms, he said, "Whatever." Nonetheless, he continued to pay her nothing for her monthly caretaking beyond the amount of his social security checks. She later testified that when she asked him about the money he still owed, Regennitter said "he would make it up to [me] in the future."

[¶ 6.] While he was in her care, Hatheway drove him to almost all his medical appointments, some fifty-six trips to doctors in Rapid City and the Veterans' Administration Hospital in Fort Meade. She tended to his empty house and yard, managed his farm, handled his finances, prepared his tax records, and dealt on his behalf with the Department of Agriculture. She made numerous long-distance telephone calls for him. When Regennitter decided to sell all his property, she arranged for an auction, assembling and readying his possessions for sale. She also found a buyer for his home, for which she received a $300 finder's fee.

[¶ 7.] Regennitter owned a house trailer that was set up on another's property. The landowner told him, after his stroke, that the trailer had to be moved. Regennitter asked Hatheway to move the trailer "to the farm." But because there was no room on his farm, Hatheway had the trailer taken to hers. As it was in very poor condition and uninhabitable at the time, Hatheway's son, Joe, repaired the trailer and lived in it, rent-free.

[¶ 8.] When Regennitter had money available, Hatheway wrote checks from his account for her expenses. These checks covered telephone bills, travel costs and items Hatheway purchased for him. She also wrote checks to pay herself the amount of Regennitter's monthly social security benefit. In all, she paid herself over $10,000. When there was nothing in his account, she drew from her own funds to pay his expenses. Hatheway again discussed with Kell how she could be paid more reasonably for her expanded services. She testified that Kell told her the best way to handle it was to submit a claim to the estate at Regennitter's death.

[¶ 9.] From time to time, she submitted bills to Regennitter, which Kell later approved. Yet Regennitter was so "financially embarrassed," Hatheway worried he would not have money enough to cover his future expenses should she bill him for all the services she rendered. In 1993, after living with her for eleven months, Hatheway assisted Regennitter in moving to a rest home in Presho. She continued to handle his mail and manage his financial affairs. Regennitter died in March 1997. One of his sisters, Marguerite Giedd, was appointed as personal representative of the estate. On July 18, 1997, Hatheway submitted a $20,333 bill to Giedd for care and services she provided to Regennitter going back seventeen years. None of these claims for additional funds had been billed during Regennitter's lifetime. The estate denied the claim and the matter was brought on for hearing in circuit court. The court found that an implied contract existed between Regennitter and Hatheway in which Regennitter had agreed to pay for her services. After deducting those portions of her claimed expenditures the judge deemed either frivolous, unsupported by the evidence, or beyond the statute of limitations, and after crediting the estate for those sums which Hatheway had already been paid, the court awarded her an amount it thought Regennitter owed her for the care she provided him in the eleven months he lived in her home and for the unreimbursed expenses she

---

1. Hatheway testified it cost Regennitter $2600 per month to live in the nursing home.

incurred on his behalf. The court found that Regennitter had agreed to pay Hatheway $800 a month during the time he stayed with her. It also concluded that the expenses the estate owed Hatheway totaled $11,448. Although she did not specifically request it, she was granted ownership of the trailer house at a value of $1000. The court subtracted this from the amount the estate owed and awarded Hatheway $10,448.

[¶ 10.] The estate now appeals asserting seven separate claims of reversible error. For ease of understanding we combine some of these issues. Others we discard for lack of sufficient merit.[2] We will consider whether the circuit court properly found an implied contract and if it correctly admitted the decedent's statements under SDCL 19-16-34.

## Standard of Review

[¶ 11.] Questions of fact are reviewed under the clearly erroneous standard. *Matter of Estate of O'Keefe*, 1998 SD 92, ¶ 7, 583 N.W.2d 138, 139 (citing *Century 21 Associated Realty v. Hoffman*, 503 N.W.2d 861, 864 (S.D.1993) (citations omitted)). Questions of law are reviewed de novo. *City of Colton v. Schwebach*, 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771 (citing *Jasper v. Smith*, 540 N.W.2d 399, 401 (S.D.1995)). Credibility determinations are best left to the trial court, thus we give those findings considerable deference. *Kappenmann v. Kappenmann*, 479 N.W.2d 520, 522 (S.D.1992) (citing *Saint–Pierre v. Saint–Pierre*, 357 N.W.2d 250 (S.D. 1984)). Claims against estates for personal services rendered to decedents require proof by clear and convincing evidence. *Mahan*, 121 N.W.2d at 370–71; *Douglas v. Beebe*, 46 S.D. 559, 195 N.W. 165, 166–67 (1923).

## Analysis and Decision

### 1. Implied Contract

[¶ 12.] The trial court held that the implied contract between Hatheway and Regennitter required the estate to compensate Hatheway beyond what Regennitter had previously paid her. The estate claims that the trial court erred in finding an implied contract because Hatheway failed to prove the existence of an agreement for added compen-

---

2. The issues as propounded by the estate are as follows: (1) "Can someone who holds a fiduciary duty to the decedent make payments to themselves during the decedent's life which the decedent and his attorney approve and then submit claims against the decedent's estate of twice what they have already received." (2) "In an estate, when the claimant['s] burden of proof requires clear and convincing evidence a contract exists and the only evidence offered was of the claimant about what she believed and what she claimed the decedent said, can the court find the evidence is sufficient to create a contract in fact or law." (3) "Should the court find a presumption of gratuitous action where the bills submitted to the estate were not submitted over a long[ ] period of time while the decedent lived, the claimant stated some matters were done gratuitously and there was more than a business relationship between the parties." (4) "Can the trial court find as a matter of fact there existed a contract where the only evidence is testimony of the claimant, the claimant fails to offer any corroboration testimony and the trial court fails to find as required by SDCL 19-16-34, the statements were made by the decedent in good faith and on decedent's personal knowledge." (5) "Where the claimant has been paid for services and has the power to submit bills and has submitted bills, and bills have been reviewed and approved, can the claimant use justifiable reliance as a basis for a contract for bills never submitted and amounts not paid." (6) "Where the only evidence of a contract came from the claimant['s] testimony, without corroboration, was such evidence sufficient to find a contract existed and there was a mutual consent to the important terms of that contract." (7) "Where the claimant made no claim the trailer belonged to her and there was no evidence the trailer was gifted or there was a sale of the trailer, could the court award the trailer to the claimant and ignore her fiduciary duty and the failure to collect rent from her son who lived in the trailer."

Issue 1 was not preserved for appeal. The estate mentioned nothing more in its proposed findings of fact to the trial court than "Hatheway owed a special duty to the decedent." It did not, however, argue this to the trial court at the hearing. The issue is deemed waived. *Wheeldon v. Madison*, 374 N.W.2d 367, 373 (S.D.1985). Issue 3 is meritless. When relatives "reside together as one family," services given one to another are presumed gratuitous. *Mahan v. Mahan*, 80 S.D. 211, 214, 121 N.W.2d 367, 368 (1963). Regennitter and Hatheway were not related.

sation by clear and convincing evidence. SDCL 53–1–3 provides in relevant part: "An implied contract is one, the existence and terms of which are manifested by conduct." In *Jurrens v. Lorenz Mfg. Co.*, 1998 SD 49, 578 N.W.2d 151, 154, we explained that " '[c]onduct' can be both acts and words. By its very nature, an implicit agreement is not as detailed as a written agreement formally negotiated." *Id.* ¶ 9, 578 N.W.2d 151 (quoting *Mathews v. Twin City Const. Co., Inc.*, 357 N.W.2d 500, 507 (S.D.1984)); *see also Lien v. McGladrey & Pullen*, 509 N.W.2d 421 (S.D.1993). We look to the totality of the parties' conduct to learn whether an implied contract can be found. *Id.* (citing *Great West Cas. Co. v. Bergeson*, 1996 SD 73, ¶ 10, 550 N.W.2d 418, 421) (other citations omitted).

[¶ 13.] Here, looking at the parties' relationship and the course of their many dealings, it was evident that an implied agreement existed. Hatheway was paying herself for Regennitter's care and expenses with both his consent and the consent of his attorney. The trial court was well within its province to conclude that although she had been partially paid for the services and expenses, she had not received full recompense in accord with their understanding. It would be inconsistent to assume that Regennitter consented to pay Hatheway for some of these expenses, but not other similar costs. We conclude the trial court's finding of an implied contract was not error.

## 2. Decedent's Statements

[¶ 14.] The estate contends that Hatheway should not have been permitted to establish her case using statements about the agreement that she attributed to Regennitter. SDCL 19–16–34, commonly known as the "Deadman's Statute," provides:

In actions, suits, or proceedings by or against the representatives of deceased persons including proceedings for the probate of wills, any statement of the deceased whether oral or written shall not be excluded as hearsay, provided that the trial judge shall first find as a fact that the statement was made by decedent, and that it was in good faith and on decedent's personal knowledge.

We liberally construe this enactment to achieve its intended purpose. *In re Congdon's Estate*, 74 S.D. 306, 310, 51 N.W.2d 877, 879 (1952) (construing predecessor statute). Admitting a statement under § 19–16–34 is within the trial court's discretion. *Martinson v. Holso*, 424 N.W.2d 664, 667 (S.D. 1988) (citing *In re Congdon's Estate*, 74 S.D. at 310, 51 N.W.2d at 879; *Cox v. Bowman*, 71 S.D. 72, 75, 21 N.W.2d 277, 278–79 (1945)).

[¶ 15.] As the estate points out, the only remark directly attributed to Regennitter about an agreement for a specific sum was his laconic "whatever" in reply to Hatheway's proposal for $800 a month. The estate claims that the trial court never affirmatively found that Regennitter actually made any statement to manifest a concrete agreement, nor did the court make any findings of fact or conclusions of law which would satisfy the requirements of § 19–16–34. The record shows otherwise. In its written findings of fact the court determined that an agreement did exist between Hatheway and Regennitter. As a conclusion of law, the court stated: "All findings of fact made herein were established by clear and convincing evidence." The court undertook the appropriate analysis of both the facts and the law and found that it could consider Regennitter's statement under this statutory exception to the hearsay rule. Alone, perhaps his statement might be insufficient, but the court weighed other circumstances. The question is whether those circumstances were adequate.

[¶ 16.] The estate claims that the decedent's statements were not sufficiently corroborated. It cites *Martinson, Matter of Estate of Fiksdal*, 388 N.W.2d 133 (S.D. 1986), and *Matter of Estate of Raketti*, 340 N.W.2d 894 (N.D.1983), for this proposition. In *Martinson*, we wrote that "self-serving testimony is alone insufficient and must be corroborated." 424 N.W.2d at 668. Yet, it is more accurate to state that an uncorroborated statement only makes the testimony

more vulnerable to a credibility attack. *Id.* at 668 (citing with approval *Raketti,* 340 N.W.2d at 900, which held that lack of corroboration goes to weight not admissibility). In *Martinson,* four brothers formed a partnership and purportedly agreed that the last survivor "takes all" the assets of the partnership. *Id.* at 665. We concluded that the challenged testimony was partly corroborated by the forty-five year course of dealing between the parties, in addition to the testimony of disinterested persons. *Id.* at 668. Here, Regennitter's conduct confirms the existence of a contract. He allowed Hatheway to write checks from his account in the amount of his payments from social security. He had her drive him to his numerous medical appointments. With his blessing, she conducted his business and personal affairs. He moved into her home and welcomed her full-time care. Not only is their course of dealing evidence the contract existed, but also Regennitter's conduct both before and after he made the statement in question strengthens Hatheway's testimony about his intention to pay the expenses.

[¶ 17.] In *Estate of Fiksdal,* this Court concluded that a coin collection was not gifted to the decedent's wife when he merely stated: "If you marry me, all of this will be yours." 388 N.W.2d at 133–34. We held that the statement failed to express the necessary intent, especially when the decedent's actions following his statement demonstrated his intent *not* to make a gift of the coin collection. *Id.* at 137–38. These are not the conditions presently before us. As we have already concluded, Regennitter's actions in every way made evident his agreement to fully compensate Hatheway for her time and effort in his service. His "whatever" remark, assenting to an increased monthly payment, was consistent with his behavior in routinely agreeing with Hatheway's claims for reimbursement.

 [¶ 18.] Absent a clearly erroneous finding, credibility is for the trial court. *See, e.g., Kappenmann,* 479 N.W.2d at 522 (citing *Saint–Pierre,* 357 N.W.2d at 250). We con-clude that the court neither abused its discretion in admitting Regennitter's statements nor clearly erred in weighing them in favor of Hatheway's claims for additional compensation.

[¶ 19.] Affirmed.

[¶ 20.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.

