## WILSON v. McWILLIAMS.

1. Evidence considered, and held sufficient to show that defendant advanced money to redeem from a foreclosure sale of plaintiff's property under an agreement to deed to plaintiff on payment of the amount advanced.

2. A mortgage on plaintiff's property was foreclosed, the property sold at foreclosure sale, and defendant, at plaintiff's request, redeemed from the sale, taking a deed in his own name, and agreeing to convey to plaintiff if he within a year paid the amount expended by defendant, with interest. Held, that the transaction was an equitable mortgage.

3. While evidence to show that a deed absolute in form was intended as a mortgage must be clear and convincing, the same degree of proof is not required to show that one who redeemed from a foreclosure sale held the land only as security for the payment to him by the mortgagor of the amount required to redeem, and occupied the position of mortgagee.

(Opinion filed July 2, 1902)

Appeal from circuit court, Moody county. Hon. JOSEPH W. JONES, Judge.

Action by James Wilson against Walter H. McWilliams to redeem certain premises alleged to be held by defendant as mortgagee. From a judgment for defendant, plaintiff appeals. Reversed.

*George Rice,* for appellant.

*Aikens & Judge,* for respondent.

CORSON, J. This action is by the plaintiff to redeem certain premises alleged to be held by the defendant as mortgagee. Findings and judgment were in favor of the defendant, and the plaintiff appeals. The plaintiff was the owner of a quarter sec-

tion of land in Moody county, and in 1889 he mortgaged the same to secure a loan thereon. In 1894 the mortgage was foreclosed and the property bid in at the sale by the mortgagee. In November, 1895, at about the end of the year for redemption, the plaintiff made arrangements to pay the taxes and interest, and thereby extend the time of redemption under the statute for another year; but it appears that there was some contention between the purchaser at the mortgage sale and the plaintiff, Wilson, as to the amount of interest that was necessary to be paid in order to extend the time for redemption, and the plaintiff, who had borrowed of the defendant, McWilliams, $100 to pay the amount of the interest and taxes; solicited McWilliams to redeem the property, and, in order to enable him to occupy the position of redemptioner, the plaintiff gave to him a mortgage on the same property for $500, and the defendant released the chattel mortgage given to secure the $100 so loaned by him to the plaintiff. Thereupon the defendant paid the amount required to redeem the property, $1,011, and some $200 or $300 back taxes,—using the sum of $264 raised by the plaintiff to extend the time of redemption, which was subsequently repaid to the plaintiff,—and took a deed to the property to himself. As to the nature of the transaction between the plaintiff and the defendant, and the agreement resulting in the redemption of the property, there is a conflict in the evidence. The plaintiff claims the money was advanced for the redemption of the property as a loan to him. The defendant, on the other hand, insists that he made no loan to the plaintiff, but redeemed the property, and took a deed to himself, for the purpose of acquiring an absolute title thereto. He admits, however, that he did agree to sell the property to the plaintiff at any time within one

16 S. D.—7

year upon the plaintiff paying him the amount advanced on the property, with 12 per cent. interest thereon.

It is contended on the part of the apellant that the findings of fact are not supported by the evidence, and that the court erred in its conclusions of law. The two important findings which the appellant contends are not so supported are the seventh and eighth, in which the court finds, in substance, as follows:   That the redemption was made by the defendant at the solicitation of the plaintiff to buy the plaintiff's equity of redemption in said land; that there was no agreement or understanding that such redemption was made for the benefit of the plaintiff, nor was there any agreement between the plaintiff and the defendant that such redemption was in the nature of a loan, nor was there any agreement on the part of the plaintiff to reimburse the defendant for the amount of money advanced by him for such redemption, but, on the contrary, the same was an unconditional sale on the part of the plaintiff, and purchase on the part of the defendant, of said land and premises; that, during the negotiation for the sale of said land and premises by the plaintiff to the defendant, defendant did say to plaintiff that he would sell him the property if he (the plaintiff) would within a year pay him (the defendant) the money advanced, with 12 per cent. interest thereon, but no other or different contract was entered into between the parties regarding said land, and in this respect it was a uniliteral agreement, and the plaintiff had not bound himself to purchase said property, and the relationship of debtor and creditor, mortgagor and mortgagee, or a trust relationship of any character, was never agreed to, or grew out of said transaction; that the plaintiff never offered to purchase said land, but, on the con-

trary, in April, 1897, at his own solicitation, he entered into a written lease for said year, and again in June, 1898, in behalf of his wife the plaintiff solicited and obtained from the defendant a second written lease for the farming season of 1898; that during the year 1899 there was no contract of leasing, but the defendant worked the land with the full acquiescence and consent of the plaintiff, and without any objection on his part; that since the purchase of said land by the defendant he broke up considerable of the same, and built fences thereon, and has in all respects treated the same as his own, and plaintiff prior to the commencement of this action never asserted any right, title, or interest in the property adverse to the defendant, and the plaintiff never offered to purchase the property prior to the commencement of this action. From the findings the court concludes, as a matter of law, that the plaintiff unconditionally sold and delivered to the defendant the land and premises in controversy, who by virtue thereof became the absolute owner in fee simple of the same; that the plaintiff has not since the 25th of November, 1895, had any right, title, or interest in or to said property. Whether or not these findings and conclusions are supported by the evidence is the principal question it will be necessary to consider on the appeal.

As before stated, the evidence is somewhat conflicting as to the nature of the transaction and the agreement entered into between the plaintiff and the defendant. The plaintiff states the transaction substantially as follows: That he had known the defendant for about 10 years, and that about the 23d of November, 1895, he borrowed from him $100, and gave him a note including $8 which he owed on book account; that at the time he gave the note he told the defendant the time had near-

ly expired for redeeming from the foreclosure of the mortgage given by him on his property; that he had not money enough to pay the taxes and interest, and for the purpose of paying that he borrowed the $100 before stated; that the ·defendant said at the time, "I would like to help you on this land deal, and, if you can fix it so I can, I will;" that he informed him that he had deposited money with the county treasurer for all back taxes, and had deposited two years' interest money on the judgment with the Moody County Bank; that there was some difficulty in regard to the amount of interest money to be paid. Defendant said, "if I would give him a mortgage for $500 he would redeem the land for me, and I could pay him." Plaintiff further says: "I came up here on the 25th of November, and I think he paid $1,011. There was about $1,275 to be paid. The balance was the money that I had in the treasurer's office for the taxes, and in the bank for interest. He said he would pay that back soon. He never paid me anything on that land, except what he paid for the redemption and the taxes. There was never any talk of a sale." The plaintiff further stated that about the first of June, 1897, he went to defendant's store and offered to pay him $300 on this land, to which defendant said: "I cannot use it now. If I got it last fall I could use it. I would rather you would keep it until you can pay all of it." In regard to the leasing the plaintiff testified that the defendant said: "I would like to have this arranged so that I could get something off this land next year towards paying for it," to which plaintiff replied: "We can fix it so that it will be satisfactory to you." Then the lease was made out, and the defendant said the proceeds of the crop were to go towards paying for the land. The plaintiff further testified that during

the summer of 1896, before the lease was made, he had prepared and plowed a large portion of the land for a crop for the spring and summer of 1897. On cross-examination the plaintiff testified: "Defendant was to put up the money for the payment of this land to redeem it from this foreclosure sale for my benefit. He was to take a sheriff's certificate and hold it until it was paid. The sheriff's certificate was to go to him and did go to him." Mrs. Wilson testified on direct examination as follows: "I am the wife of James Wilson, the plaintiff. I am acquainted with Mr. McWilliams. Have known him about ten years. Some time late in the fall or first part of the winter of 1897, I had a conversation with McWilliams about this land of my husband's. I went down to his place, and I asked him if he owned our land. He says, 'I do.' I says, 'How is that?' He says, 'You failed to pay back the money that I loaned you, according to agreement, and, of course, now the land is mine.'" On cross-examination she says: "I remember distinctly what I said. I asked him if he owned our land—that piece of land. I asked him if he owned that piece of land we borrowed money on. He said he did. I asked him how he came to own it, and he said we failed to pay him back the money he loaned us, and for that reason the land was his; that we had not paid him back as we had agreed to. I told Mr. Wilson the same day what McWilliams had told me. I presume I have talked it over with Mr. Wilson since that time." Mr. Roger Brennan, called as a witness on behalf of the plaintiff, testified as follows: "In 1895 I had a conversation with Mr. McWilliams in regard to the land deal with Mr. Wilson. I know the Wilson land. I had four or five conversations with Mr. McWilliams. The first conversation I had with Mr. McWilliams was after Mr. Wilson had

some trouble in regard to getting a year's extra time. It was through this conversation I went to see him. I went to see McWilliams and broached the subject to him of furnishing the money to Mr. Wilson. The first time I saw him he said he would not have anything to do with it, and afterwards he said he didn't know but what he would. The next conversation he wanted to know of me if the thing could be fixed up right, so that there would be no question about his title to the property. I told him I thought it could be fixed up all right. He said if that was the case he would not object to furnishing the money. Wilson and he and I were together at the next conversation, as I remember it. At that conversation it was talked between Mr. Wilson, himself, and me that he was to have a right to come up there and redeem. * * * So it was agreed upon that Wilson should give a mortgage of $500, and that McWilliams would satisfy this $108 mortgage, so he would have a right to redeem, and that the judgment creditors of Wilson would not be after the land. * * * Mr. McWilliams told him that he was not doing this for fun, and that he wanted everything straight, so that he had a good title to the land, but he would give him his word—he said he would give him no papers—that, if he would pay him back inside of a year, with 12 per cent, on the money he paid in there, that he would give him a deed of the place back. Wilson agreed to do it." Roger Brennan further testified on behalf of the plaintiff: "Mr. Wilson told McWilliams that, if he did not do that, the land was gone, and he would prefer to have him have it, to a stranger. I was with McWilliams on Mr. Wilson's place some time in the fall of 1896. Mr. McWilliams asked Mr. Wilson if he thought he was going to have money by the time the year was up to pay for that

July, 1902]          Opinion of the Court—CORSON, J.

place. Wilson told him he thought he would be ready to meet it,—be ready to pay it up. McWilliams said, 'your crop don't look as though you could do it.' Wilson says, 'Well, I think when I thresh, and sell some cattle, with what I can borrow, I can pay it up, all right.'. There was some talk there, but I can't remember it. I think that McWilliams said something about that he would not ask any rent if he was going to pay up. There was some talk about rent. I know McWilliams said it was all right if he got his money according to his agreement. Q. During any of those conversations, did you hear anything said by either party about Mr. Wilson selling this land to Mr. McWilliams, or McWilliams selling it to Mr. Wilson. A. All the conversation I heard that would lead to that was when the bargain was made,—when McWilliams told him he meant business, and that the title should be made straight in him, and it would be all right, and he would give him his word that if he would pay him at the end of the year his money back, with 12 per cent. interest, he would deed the place back to him, That was the only conversation that would lead to it. There was nothing said about selling or buying. Only McWilliams said, 'If you can fix up the title so it is in me, I will furnish the money.' There was nothing said about helping Wilson." The material part of his cross-examination was as follows: "Q. Isn't it a fact that at that time McWilliams said to Wilson, in substance, that he wanted to know whether or not Wilson would be likely or liable to raise enough money to buy that farm back, as they agreed upon? A. I don't know as there was anything said about buying the farm back. McWilliams wanted to know whether he was going to get his money or not, because he said he had other places he could use it if he was

going to get it back.  I don't think, to the best of my recollection, there was anything said in that conversation about selling it back.  * * *  Q. Who was it provided the scheme by which McWilliams was to be enabled to redeem?  Was that McWilliams' or Wilson's?  A. Mr. Wilson spoke about it first, —about the redemption; that he was owing him $108 and some cents.  Wilson said to McWilliams, in substance, some time before McWilliams furnished any money:  'I cannot get the money to redeem, anyway.  I am going to lose this land. I would rather you would have it, than it should go to this mortgagee or a stranger.'"  To a question by the court, he says:  "The way I understand the matter in that deal was that Mr. McWilliams would have nothing to do with it unless he could get what he called a 'perfect title' to the property. This was mentioned positively at the time.  He says: 'I will give you no writing,—no written agreement or any papers,— but I will give you my word that if you pay me back the money I have paid for this deed, with twelve per cent. interest, within a year, I will deed the place back to you.  I will give you the deed of it.'"  Mr. McWilliams, sworn on his own behalf, gave about the same version of the transaction as was given by Brennan, but he thinks that he did use in some part of the conversation the term "resell the land" to the plaintiff, though he was not quite positive in regard to it.

It is contended on the part of the plaintiff that as it appears in this case from the evidence that the defendant agreed to redeem the property to the plaintiff for the amount of money paid out by him on this redemption, and 12 per cent. interest, at any time within a year, the rule applicable to evidence to prove that an absolute deed was intended as a mortgage does

not apply.   The counsel, in his argument, contends that the court should distinguish the case at bar from those cases in which a grantor seeks by parol evidence to show that a deed absolute in terms conveys a less title than it purports to convey; that the plaintiff at the time of the original transaction executed no instrument inconsistent with the claim now made by him, and hence has not the presumption to overcome that the person executing a deed would have.   Of course, the rule is too well established to require citation of authorities that, to show by parol evidence that a deed absolute was intended as a mortgage, it must be of the most clear and convincing character.   And this rule, as we understand, is not questioned by the counsel for appellant.   But he claims that where there is an agreement to convey, and evidence has been introduced tending to show that the transaction was one of security, leaving upon the mind a well-founded doubt as to the nature of the transaction, then courts of equity are inclined to construe the same as a mortgage.   Gassert v. Bogk, 7 Mont. 585, 19 Pac. 285, 1 L.R. A. 240; Conway v. Alexander, 7 Cranch, 218, 3 L. Ed. 321.   It is quite clear from the evidence that the defendant advanced or furnished to the plaintiff the sum of $1,275 to redeem this property from the foreclosure sale.   It will be noticed from the evidence that there was nothing said by the plaintiff about selling the property to the defendant, nor was there any conversation relative to the value of the property between them.   The defendant admits that the property at the time was worth about $2,000.   It will be further noticed that, in the conversation between the defendant and the plaintiff relating to the payment of the money advanced on the property, nothing is said as to repurchasing the property, but the transaction is spoken of as

paying back to the defendant the amonnt he had advanced and interest. What, then, was the nature of the transaction? Was the money advanced by the defendant as a loan upon the prop· erty, or was it a bona fide purchase of the property by the defendant? The general rule seems to be that where money is advanced, at the request of the mortgagor, to bid in the property at a sheriff sale, and the title thereto is taken in the name of the person advancing the money for the benefit of such owner, with the understanding that he will convey the same back to said owner on the payment of the money, the transaction in equity constitutes a mortgage. Hoile v. Bailey, 58 Wis. 434, 17 N. W. 322; Schriber v. LeClair, 66 Wis. 579, 29 N. W. 573, 889; Phelan v. Fitzpatrick, 84 Wis. 240, 54 N. W. 614. Certainly there could be no distinction between advancing and furnishing money to redeem property from such sale. This rule of equity would apply to both cases. Again, while it is undoubtedly true that, to show that a deed in effect an absolute conveyance is intended as a mortgage to secure the debt, the evidence must be clear, satisfactory, and convincing, yet if, from all the evi· dence, a doubt arises as to whether the transaction was a mortgage or a conditional sale, such doubt must be resolved in favor of holding the instrument a mortgage. Baird v. Reininghaus, 87 Iowa, 167, 54 N. W. 148; 3 Pom. Eq. Jur. 1195. In Gassert v. Bogk, supra, the supreme court of Montana uses the following language: "Where there is a deed, and contract to re-convey, and oral evidence has been introduced tending to show that the transaction was one of security, and leaving upon the mind a well-founded doubt as to the nature of the transaction, then courts of equity incline to construe the transaction as a mortgage. See Morris v. Budlong, 78 N. Y. 543; Cosby v. Bu-

chanan (Ala.) 1 South 898; Ferris v. Wilcox, 51 Mich. 105, 16
N. W. 252, 47 Am. Rep. 551; Conway v. Alexander, 7 Cranch,
218, 3 L. Ed. 321; Hicman v. Cantrell, 9 Yerg, 171, 30 Am. Dec.
396.   But where there is deed alone, and it is sought to show a
parol defeasance, then, it seems, the evidence must be clear and
convincing." It is admitted by the defendant, and it is a con-
ceded fact in this case, that the defendant did agree to redeed
the property to the plaintiff upon the payment of the amount
advanced within one year; hence the rule above stated, that
courts of equity incline to consider the transaction as a mort-
gage, applies to this case.   While the inadequacy of the con-
sideration would not be conclusive against the transaction be-
ing a conditional sale, it is a circumstance of much weight to
be considered in determining the nature of the same.   In
Hoile v. Bailey, supra, the supreme court of Wisconsin uses
the following language:   "Whenever property is transferred,
no matter in what form or by what conveyance, as a mere se-
curity for a debt, the transferee takes merely as a mortgagee,
and has no other rights or remedies than the law accords to
mortgagees."   And this, we think, may be stated as a general
rule.   While conditional sales are not prohibited by letter or
policy of law, courts of equity will protect parties from con-
verting a real mortgage into a conditional sale.   In Conway
v. Alexander, supra, the supreme court of the United States,
by MARSHALL, C. J., in speaking of conditional sales, says:
"As lenders of money are less under the pressure of circum-
stances which control the perfect and free exercise of the judg-
ment than borrowers, the effort is frequently made by persons
of this description to avail themselves of the advantage of this
superiority in order to obtain inequitable advantages.   For

this reason the leaning of courts has been against them, and doubtful cases have generally been decided to be mortgages."

The respondent contends that the execution of the leases by the plaintiff is entirely inconsistent with his claim that the transaction constitutes a loan, and not a sale, but we attach but little importance to the making of these leases. Parties seeking to take an undue advantage of mortgagors situated as the plaintiff was in this case almost invariably seek to cover up the transaction by inducing the party to whom the loan was really made to take a lease of the property; hence the mere fact of leasing should have but little weight with a court of equity, which seeks to discover the real transaction.

Upon a careful review of the evidence in this case, we are inclined to take the view that the transaction between the plaintiff and the defendant constituted, in effect, a mortgage between the parties, and not a conditional sale. The plaintiff, having solicited and requested the defendant to advance the money required to redeem the property from sale, became liable to the defendant therefor, notwithstanding there was no note or memorandum made by the plaintiff agreeing to repay the amount. The relation of debtor and creditor therefore existed between the parties, which is one of the essential requisites to constitute a transaction a mortgage.

We are of the opinion that the evidence in the case clearly preponderates in favor of the plaintiff, and that the transaction between him and the defendant constituted a mortgage. The court therefore erred in its findings and conclusions of law in favor of the defendant. The judgment of the court below is reversed, and a new trial granted.