2002 SD 10

**Wallace ADRIAN, Plaintiff and Appellee,**

v.

**Rich McKINNIE and Lynn McKinnie, Defendants and Appellants.**

**No. 21963.**

Supreme Court of South Dakota.

Considered on Briefs Nov. 13, 2001.

Decided Jan. 23, 2002.

Michael A. Wilson of Quinn, Day & Barker, Rapid City, Attorneys for plaintiff and appellee.

Michael W. Strain of Morman Law Office, Sturgis, Attorneys for defendants and appellants.

KONENKAMP, Justice.

[¶ 1.] This is an appeal from a judgment on the status and effect of a "Lease Agreement & Option to Purchase" relating to a 600–acre tract of land in Custer County, South Dakota. The trial court, treating this document purely as a lease-purchase agreement, found that the lessees breached the agreement and failed to cure their breach and that the terms of the agreement entitled the lessor to terminate the lease. We reverse because the lease was a device to secure an advancement of purchase money, and, therefore, it constituted an equitable mortgage.

### Background

[¶ 2.] In 1994, Rich and Lynn McKinnie purchased approximately 600 acres of land in Custer County from Dorothy Welsh on a contract for deed. Shortly thereafter, the McKinnies purchased an adjoining tract of 53 acres from Josephine Relf. Upon obtaining a loan of $110,000 from Butch McKinnie (no relation to Rich and Lynn), the McKinnies obtained title to the 600 acres when they paid Welsh in full. To get the loan from Butch McKinnie, the McKinnies conveyed title to him and entered into a contract for deed to secure the debt. After taking possession of the 600–acre tract, the McKinnies made various improvements, installing a well and pipeline system at a cost of approximately $20,000.

[¶ 3.] Not long after obtaining the loan from Butch McKinnie, the McKinnies, suffering strained financial circumstances, began seeking alternative financing at a lower rate of interest. In the later months of 1997, the McKinnies consulted with Wallace Adrian, the owner of a 2,280–acre tract adjoining the 600 acres. The McKinnies were on friendly terms with him, as Adrian had previously leased the 2,280–acre parcel to the McKinnies and was pleased with their stewardship. The McKinnies' financial difficulties increased, and Butch McKinnie threatened to foreclose and develop the property. At that time, Adrian had no interest in owning the 600 acres, but neither he nor the McKinnies wanted to see the tract developed. Accordingly, Adrian agreed to provide the McKinnies financial assistance in purchasing the land.

[¶ 4.] At an initial meeting between the parties and their attorneys in October

1997, they considered a promissory note secured by a mortgage against the property. Adrian, however, was concerned that creditors might take action to collect on the McKinnies' substantial debts. He rejected a mortgage and insisted on being completely secured, so that if the McKinnies failed to make their payments, the land would automatically be his. As additional security, Adrian required that the McKinnies deed him an additional 15 acres of their own land, which would be deeded back to them upon their having made total payments of $10,000. The result was a "Lease Agreement & Option to Purchase" drafted by the McKinnies' attorney. It is the import of this agreement that is in question here.

[¶ 5.] The record shows that Butch McKinnie received $122,000 for the 600–acre tract. Upon receipt of that sum, Butch McKinnie deeded the tract to the McKinnies. They in turn deeded it to Adrian as part of the "Lease Agreement & Option to Purchase." As an obviously critical part of the agreement between the McKinnies and Adrian, Adrian paid into an escrow account a sum of $122,000, which was then transferred to Butch McKinnie. This three-way transaction left Butch McKinnie with $122,000, Adrian with ownership of the 600 acres, and the McKinnies with an option to purchase the tract upon their paying Adrian a total of $140,662.68 over ten years (with payments to be made twice per year), provided that they pay, in addition, one dollar at the end of the ten-year period. The agreement also afforded the McKinnies the option to buy the land at any time before the ten-year period ran, upon their paying Adrian the $140,662.68. On the other hand, the McKinnies would have no further claim to title if they failed to make payments in accordance with the agreed schedule.

[¶ 6.] Up until the summer of 1999, relations between the parties were amicable, and the McKinnies made their scheduled payments. But in that summer, the McKinnies missed a payment, and Adrian gave notice of default. The McKinnies eventually made a late payment before Adrian could terminate the lease in accordance with the agreement. Relations continued to worsen until the spring of 2000, when each party sued the other. The McKinnies sought specific performance of their offer to pay off the sum remaining. Adrian sought to terminate the agreement on the ground of material breach. These actions were consolidated into the case before us.

[¶ 7.] Another notable circumstance arose during that summer: both parties were contacted by a Rapid City resident, Carolyn Robbins, who indicated that she and other investors were interested in purchasing the 600–acre parcel from whoever was the real owner. The clear implication of this overture was that Robbins and her investors were willing to pay substantially more for that property than the sum for which it had last been sold.

[¶ 8.] In its decision, the trial court ruled that the McKinnies had materially breached the lease and option to purchase and had failed to cure their breach. The court also found that the McKinnies had unclean hands because during the lease they harvested excess lumber from the property in violation of the lease agreement. On appeal, the McKinnies raise the following issues: (1) The Lease Agreement & Option to Purchase was in actuality a mortgage, rendering questions of default irrelevant. (2) There was no breach of the agreement in harvesting timber. (3) There was no material breach in failing to close within the specified time in the agreement. Because we deem the

first issue dispositive in this appeal, we need not reach the other two issues.[1]

### Equitable Mortgage

[¶ 9.] Although the circuit court addressed the equitable mortgage issue by questions to counsel during trial, in neither its findings of fact nor its conclusions of law did the court explain why it rejected the McKinnies' suggested remedy. The court simply refused the McKinnies' proposed findings on the point. Because the recharacterization of a document is an equitable remedy, a court has discretion to grant or deny it. *Englehart v. Larson*, 1997 SD 84, ¶ 12, 566 N.W.2d 152, 155. Our standard of review, therefore, is abuse of discretion.

[¶ 10.] To say that a decision is discretionary is not to mean that it is unguided. This is especially true in equity cases, where discretion is more carefully scrutinized. "Equity discretion should not be confused with routine managerial discretion." 1 Childress and Davis, Federal Standards of Review § 4.16 n.1 (3d ed.1999) (citation omitted). Discretionary choices in equity are bounded by the course of precedent and the substantive rules governing permissible remedies. A court will have no discretion, for example, to rely on improper factors or to make choices tainted by errors of law. *See State v. Ashbrook*, 1998 SD 115, ¶ 6, 586 N.W.2d 503, 506 (citation omitted). If facts plainly exist to warrant equitable relief and no facts exist to disentitle a party to such relief, then a court is not free simply to ignore the remedy in the name of discretion. Consistency and fairness require courts to decide similar cases similarly. It follows that when a court gives reasons for its exercise of discretion, we will of course review those reasons with some deference. However, when a court gives no justification for its exercise of discretion, then, of necessity, our review broadens. We will examine the entire record to see whether reasons and facts exist to support or refute the court's discretionary choice. Here, on careful review of the evidence, we find little reason to deny equitable relief to the McKinnies.

[¶ 11.] A document executed with the formality of a contract will ordinarily be taken to express its true intent on its face. *Commercial & Sav. Bank v. Cassem*, 33 S.D. 294, 145 N.W. 551, 552 (1914). One claiming such a document to be in fact a mortgage, although it appears to be something else, will have the burden of proving that it is a mortgage by clear and convincing evidence. *Id.* (citations omitted). Deciding whether a document, absolute in form, constitutes a mortgage depends on the intent of the parties. This controlling intention must be gleaned from the written memorials and all the surrounding circumstances. *Fuller v. Middaugh*, 76 S.D. 288, 77 N.W.2d 841, 842 (1956).

> One of the essential elements of mortgage is a debt to be secured.... One of the strongest proofs that a transaction of this character is intended by way of sale, rather than by way of mortgage, is that a pre-existing debt was regarded and treated by the parties as extinguished or discharged by the conveyance.

*Am. Nat. Bank v. Groft*, 56 S.D. 460, 229 N.W. 376, 379 (1930) (citing 41 CJ 287;

---

1. As in all appeals touching a trial court's findings of fact, we apply the clearly erroneous standard of review to those findings. *In re Regennitter*, 1999 SD 26, ¶ 11, 589 N.W.2d 920, 923 (citations omitted). Questions of law are reviewed *de novo*. *Id.* Credibility findings are best left to the trial court; therefore, we give those findings considerable deference. *Id.*

Jones on Mortgages (8th ed.) §§ 314, 316, 318).

[¶ 12.] Here, if either of the parties had considered the conveyance to have been absolute, then both—and, in particular, Adrian—should also have considered the McKinnies' debt to Adrian satisfied. However, the record is clear that, because he was not interested in owning the 600 acres at the time of the agreement, Adrian agreed that the McKinnies could pay him the sum of $140,662.68 in return for his paying off the McKinnies' note to Butch McKinnie for $122,000. The record is undisputed that, at the time the agreement was memorialized, Adrian and the McKinnies were on friendly terms; Adrian wished to help the McKinnies out of their financial difficulties, and he did so by offering them a relatively low repayment rate on his $122,000 outlay.

[¶ 13.] There is ample reason to conclude that both parties intended their lease with purchase option to be a security device to protect Adrian's loan. Their situation is quite analogous to that detailed in *Pittwood v. Spokane Sav. & Loan Soc.*, 141 Wash. 229, 251 P. 283 (1926).

> A foreclosure would entail a very considerable additional expense for attorney's fees and costs and would interfere more or less with a sale of the property. The appellants had no immediate hope of paying the indebtedness. Under these conditions they did that which many another man has done under identical circumstances, to wit, gave the absolute title to the mortgagee in satisfaction of the indebtedness, with the right to repurchase within a year for the amount of that indebtedness plus interest, taxes, and other sums paid.

*Id.* at 285. Adrian knew that the McKinnies were in difficult financial straits, but Adrian, like the mortgagee in Pittwood, wished to avoid potential competition with other creditors, as well as the considerable additional expense that foreclosure on a mortgage would entail in the event of default by the McKinnies. Likewise, the McKinnies had no other option to escape the onerous terms of their previous agreement with Butch McKinnie than to borrow the money from Adrian, which he made available to them on more favorable terms.

[¶ 14.] The record reveals that both Adrian and the McKinnies had an interest in seeing that the land not be developed, but it also shows, as noted earlier, that at and before the time of the agreement, Adrian was not interested in buying or owning the property. Perhaps Adrian's interest in owning the property changed after he became aware, in the summer of 1999, that a third party might be willing to pay substantially more for the property than the sum he had given the McKinnies in exchange for the deeds. Perhaps not coincidentally, the McKinnies found soon thereafter that they could secure financing to pay off Adrian in full.

[¶ 15.] In addition, the lease and option agreement required the McKinnies to deed to Adrian a 15–acre tract of their own land in addition to the 600–acre tract they transferred to Adrian and leased back. Adrian was to return—and did return—the deed to the additional 15 acres upon the McKinnies' payment of the first $10,000 of certain "rental payments" under the agreement. Adrian required the additional acreage as an apparent additional "security" for his outlay. If Adrian had seen himself purely in the position of being the owner of the 600 acres, additional "security" would seem unnecessary. In *Wilson v. McWilliams*, 16 S.D. 96, 91 N.W. 453 (1902), the situations of the parties were similar to those of the McKinnies and Adrian. In *Wilson*, we quoted with favor the Montana Supreme Court's language in Gassert v. Bogk:

[w]here there is a deed, and contract to re-convey, and oral evidence has been introduced tending to show that the transaction was one of security, and leaving upon the mind a well-founded doubt as to the nature of the transaction, then courts of equity incline to construe the transaction as a mortgage.

*Id.* at 456 (quoting 19 P. 281, 285 (Mont. Terr. 1888)). As in *Wilson,* so here: one party agreed to re-convey the property after payment in full.

▆▆▆▆ [¶ 16.] Adrian points out that the McKinnies' complaint seeking specific performance refers to Adrian as the owner in fee simple of the 600 acres. Adrian admits that allegation in his answer. The McKinnies' complaint also alleges that they leased this property from Adrian by contract dated October 10, 1997. Adrian contends that these allegations conclusively determine the case. *See Tunender v. Minnaert,* 563 N.W.2d 849, 856–57 (S.D. 1997) (citing *Standard Cas. Co. v. Boyd,* 75 S.D. 617, 71 N.W.2d 450 (1955)); *Goff v. Goff,* 72 S.D. 534, 37 N.W.2d 251 (1949); *Englund v. Berg,* 69 S.D. 211, 8 N.W.2d 861 (1943). Under our modern rules of pleading, however, we will not read allegations hypertechnically, especially where the issues were fairly litigated in trial. *House of Seagram, Inc. v. Assam Drug Co.,* 83 S.D. 320, 159 N.W.2d 210, 213–14 (1968) ("free and open competition" though admitted in the pleadings should not be accepted as establishing its existence). Here, the meaning of the word "lease" in the McKinnies' complaint is precisely what is at issue. To take that word in its technical, legal sense and use it as an admission against interest assumes that the answer to the root question at issue had already been decided in the pleadings even though the parties later went to trial on that issue. Nothing in these pleadings commands such an outcome. But as we have seen, many of the facts and circumstances brought out in trial simply make no sense if this agreement is understood to have been a genuine lease-purchase.[2]

▆▆▆▆ [¶ 17.] Lastly, Adrian contends that the trial court's finding that the McKinnies acted with unclean hands disentitles them to equitable relief. When claimants seek equitable relief in an instance where they would ordinarily be permitted such relief, they will nonetheless be denied the relief if they acted improperly or unethically in relation to the relief they seek. Dobbs, Law of Remedies, § 2.4 (1973). Unrelated misconduct will not bar relief: "What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts." *Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349 (9th Cir.1963). No matter how wrong the McKinnies may have been in taking excess timber off the land, those acts have nothing to do with how the agreement here was formed. The trial court's unclean-hands finding will not bar equitable relief.

[¶ 18.] In accordance with our observation in *Wilson,* the fact that Adrian during negotiations insisted on calling—and both parties in their written agreement and pleadings did call—the contract a "lease" does not impair a court's power in equity to recharacterize the instrument to express its true intent:

As lenders of money are less under the pressure of circumstances, which control

---

**2.** "Parties seeking to take undue advantage of mortgagors situated as the plaintiff was in this case almost invariably seek to cover up the transaction by inducing the party to whom the loan was really made to take a lease of the property; hence, the mere fact of leasing should have little weight with a court of equity, which seeks to discover the real transaction." *Wilson,* 91 N.W. at 457.

perfect and free exercise of the judgment, than [are] borrowers, the effort is frequently made by persons of this description to avail themselves of the advantage of this superiority in order to obtain inequitable advantages. For this reason, the leaning of courts had been against them, and doubtful cases have generally been decided to be mortgages.

*Wilson,* 91 N.W. at 456 (citing *Conway's Ex'rs v. Alexander,* 11 U.S. 218 (7 Cranch 218), 3 L.Ed. 321 (1812)).

[¶ 19.] The trial court abused its discretion in not declaring the "Lease Agreement & Option to Purchase" to be an equitable mortgage. Therefore, we remand this case to the circuit court for further proceedings consistent with this opinion.

[¶ 20.] Reversed and remanded.

[¶ 21.] GILBERTSON, Chief Justice, SABERS and AMUNDSON, Justices, and GORS, Acting Supreme Court Justice, concur.