#23837-rev & rem-JKK

**2006 SD 69**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

WILLIAM G. MYERS, TRUSTEE
WILLIAM G. MYERS, LIVING TRUST,
DATED 11-25-94,                          Plaintiff and Appellee,

  v.

MICHAEL R. EICH and
SHERI L. EICH,                           Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
MOODY COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE DAVID R. GIENAPP
Judge

\* \* \* \*

ROGER W. HUNT of
Hunt Law Office                    Attorney for plaintiff
Brandon, South Dakota              and appellee.

THOMAS K. WILKA of
Hagen, Wilka & Archer, P.C.        Attorneys for defendants
Sioux Falls, South Dakota          and appellants.

\* \* \* \*

ARGUED ON MAY 24, 2006

OPINION FILED **07/26/06**

KONENKAMP, Justice

[¶1.]        In 1999, William Myers advanced Michael and Sheri Eich $125,000 to redeem their property from foreclosure.  The transaction between the parties included a warranty deed and contemporaneous contract for deed.  Over the next several years, Myers continued to advance the Eichs money.  With one advance, Myers amended the 1999 contract for deed; with another, he had the Eichs execute new warranty deeds.  The Eichs, however, could not get ahead and became delinquent on their obligation.  Ultimately, Myers informed them that he was going to sell the property.  He then brought a forcible entry and detainer action, alleging that he was the fee simple owner of the property and the Eichs were leasing the premises from him.  The Eichs, however, asserted that an equitable mortgage existed and Myers was required to proceed by a foreclosure action.  The circuit court agreed with Myers and the Eichs appeal.  Because the initial transaction bears the central earmarks of an equitable mortgage and should have been so construed, and nothing in the subsequent actions changed the character of the initial transaction, the circuit court abused its discretion in concluding otherwise.  We reverse and remand.

## Background

[¶2.]        Since 1980, Michael and Sheri Eich lived on sixty-four acres they owned in Moody County, South Dakota (the home property).  In 1995, the Eichs purchased land next to the home property to operate a truck repair business (the shop property).  After the Eichs purchased the shop property, they gave First Bank

of South Dakota a mortgage in 1996 using both the shop and home property as collateral.

[¶3.] Three years later, the Eichs became delinquent on this mortgage loan and First Bank foreclosed on both properties. During the Eichs' redemption period a broker contacted William Myers believing that he might assist the Eichs. According to Myers, the broker told him that the Eichs needed $200,000 to redeem their property but were only able to finance $75,000 through First National Bank of Brookings. Myers agreed to provide the additional $125,000 through his trust, William G. Myers Living Trust (WGMLT).

[¶4.] The arrangement between Myers and the Eichs was summarized by Myers in a letter to the Eichs. The letter was printed on Myers Real Estate letterhead and was entitled "Instructions to Borrowers." In the body of the letter, Myers noted that he was a licensed real estate broker. He then described their transaction:

> WGMLT is lending you $125,000 to acquire your property from US Bank. In return, you are to repay to WGMLT $135,000.00 plus interest of 14% per annum in monthly payments of $1,800.04 per month starting on October 1, 1999 for 180 payments. . . . To provide security to WGMLT for this transaction, WGMLT is purchasing your property above described as Parcel 1[the home place] for $1.00 and the above described Parcel 2 [the shop property] from US Bank for $125,000 plus other funds you are furnishing and then selling these two parcels to you for $135,000 on a contract-for-deed (CFD) with 14% interest.

In accord with the letter, Myers prepared and the Eichs signed a warranty deed dated September 1, 1999, purporting to convey the home and shop properties. Contemporaneously, Myers executed a contract for deed, whereby he agreed to re-

convey both properties to the Eichs upon their payment of $135,000 in monthly installments of $1,800.04 from October 1, 1999, through September 1, 2014, at a rate of fourteen percent interest per annum. The $135,000 obligation represented $125,000, plus a $10,000 fee Myers charged for the advance.

[¶5.]          On September 2, 1999, Myers filed the warranty deed with the Moody County Register of Deeds. In the following month, Myers responded to a questionnaire from the Moody County Office of Equalization, regarding an annual assessment to sales ratio. In this questionnaire, he characterized the September 1, 1999 transaction:

> This property was in foreclosure and the purchase by [WGMLT] was followed by a sale to [the Eichs] via contract for deed not yet filed. This purchase and resale was simply a security vehicle to secure to WGMLT the money loaned to Eich to redeem the property from foreclosure. Therefore, none of the information requested on the form required by SDCL 10-11-54 thru 60 would be reflective of a true sale or sales price.

The reason the contract for deed was not yet filed, according to Myers, was because the Eichs "had other debts they wanted to clear up." The Eichs started making their monthly payments on September 29, 1999, as required by the contract for deed. Myers documented the Eichs' payments in his computer-generated amortization schedule. He explained that the computer program recorded the amount of the Eichs' payments and date received. The program then calculated the interest paid and principal due after each payment in relation to the total obligation and interest rate charged.

[¶6.]          The amortization schedule reflected that the Eichs continued to make timely payments from September 1999 until April 2001. In 2001, however, the

Eichs began experiencing financial difficulties. They had defaulted on a $25,000 mortgage loan that had been secured through the Farmers Home Administration in 1980 for the home property. Myers agreed to assist them and either paid or assumed the remaining balance, $40,098.74. Thereafter, Myers created an amended contract for deed. In the amended contract, Myers noted that "the Eichs now wish to borrow Forty Thousand Ninety-Eight and 74/100 Dollars ($40,098.74) to pay off a Real Estate Mortgage dated November 17, 1980 . . . given by [the Eichs], WROS, to United States of America, acting through the Farmers Home Administration. . . ." The Eichs signed the amended contract for deed on April 4, 2001, and, on April 24, 2001, Myers recorded this contract along with the original contract for deed dated September 1, 1999. Both the 1999 contract for deed and the 2001 amended contract for deed related to the same tracts, the home and shop properties.

[¶7.]    With this additional obligation, the new contract for deed increased the Eichs' monthly payments to $2,353.56, with the same fourteen percent per annum interest rate. Beginning in May 2001, the Eichs paid the new monthly amount. However, in August 2001, the Eichs were again experiencing financial difficulties as a result of an IRS tax lien. Myers agreed to loan them $21,000. In return, Myers charged a $1,000 fee and took a lien on the trucks the Eichs owned. This loan was separate from the arrangement relating to the home and shop properties and was documented by Myers through a separate amortization schedule. Also, the circumstances surrounding this loan are not part of this appeal. However, the fact

that Myers loaned the Eichs additional money is relevant in understanding the nature of the parties' relationship.

[¶8.]       Returning to the Eichs' obligation under the amended contract for deed, the Eichs made payments from the latter part of 2001 until December 2002. During all of 2002, however, the amount and timeliness of the payments were inconsistent and irregular. The Eichs would later recount that Myers accepted whatever amount they could pay, and in many instances they paid him by endorsing over company checks. However, the amortization schedules Myers kept show that although multiple payments were received in January 2002, after that date no payments were received until June 2002. From June 2002 until December 2002, the Eichs made payments, but the monthly amounts varied.

[¶9.]       On January 15, 2003, the amortization schedule shows that Myers advanced a "loan" of $64,800. According to the Eichs, on January 4, 2003, the First National Bank of Brookings sent them notice that it was going to foreclose on a $75,000 mortgage loan they had secured on their property in August 1999. With foreclosure imminent, Myers agreed to have the remaining obligation assigned to WGMLT. This arrangement, unlike the previous instance when Myers advanced the Eichs additional money, did not result in an amended contract for deed. Instead, Myers presented and the Eichs signed two new warranty deeds. The new deeds conveyed the same property as the 1999 deed purported to convey and was filed with the Moody County Register of Deeds on January 15, 2003.

[¶10.]    The Eichs' financial difficulties persisted.  Myers had not received a payment from them since December 2002.  On March 11, 2003, Myers sent the Eichs a letter, stating,

> I have been studying the two loans you have with us and trying to come up with some way that you can recover your property and that I can recover my money.  So far I don't have anything to offer except as follows.
> On the first loan we made to you, after we had paid off the bank twice, paid off FmHA, paid your back real estate taxes and insurance, as of 3/15/03 you will owe us $264,625.89.
> I don't know how to get this from you other than to sell the farm and the shop, and I don't know if the two of them will bring that amount.  One other thought I have had is that I could rent the farm and shop to you for a year at $3,500 per month and see if the picture looks better for you at the end of one year.  If we do that I will have to have the rent each month on time. . . .
> I need to know your thoughts on this because, as I am sure you know, having $291,418.04 out there with no payments coming in has not put me in a good situation.

The Eichs did not contact Myers in response to this letter, but nonetheless made a payment on April 2, 2003, of $3,500.

[¶11.]    They continued to make monthly payments through May 2004.  However, the amount they paid each month was inconsistent and only equaled $3,500 one other time.  In December 2003, Myers mailed the Eichs a copy of the amortization schedule along with the following note:

> We had agreed that I would get $3,500 per month on the acreage, the home & the shop.  So far this year I have gotten $17,968.30 or an ave[.] of $1,497.36 per month- vs the $3,500.00 we are suppose to get.  So far this year it has cost us $15,542.16 in taxes & insurance to own this property.  That is about $1,295.18 per month.  This does not include the $64,800.00 we paid your bank to save the property nor does it include any interest on the money we have in these properties.  Can you see why I think there is something wrong with this picture & keep after you to sell trucks that are not bringing in any money & to get us PAID?

The schedule accurately reflects the advances Myers provided the Eichs, including certain instances when he paid the Eichs' real estate taxes and property insurance. There are other advances on the schedule that Myers later described as expenses he incurred and not obligations of the Eichs. However, the amortization schedule does not distinguish between these expenses and the Eichs' existing obligation, nor does the record provide clarification.

[¶12.]     Nonetheless, after receiving this correspondence, the Eichs paid Myers in January, February, and March 2004. No further payments were made. As a result, Myers sent another letter to the Eichs on May 5, 2004. He reminded them that he "was to get a monthly rent of $3,500 and [the Eichs] were to have one year in which to arrange purchase of the properties." Because insufficient payments had been made, he informed them that he had "no choice but to put the properties on the market" and he hoped that they could buy them.

[¶13.]     According to the Eichs, they tried everything to obtain financing, but on August 11, 2004, Myers sent them a notice to quit, demanding that they surrender both the home and shop properties. The Eichs hired an attorney, who advised them that the solution was to pay Myers for the properties. Consequently, two purchase agreements were prepared in September 2004. Ultimately, the Eichs could not secure funding and the transactions were never completed. However, Mike Eich's sister paid Myers $202,000 on October 1, 2004, for the home property. That left the shop property still in question. Myers brought a forcible entry and detainer action. He sought to evict the Eichs, claiming that he owned the shop property and the Eichs were merely leasing it from him. The Eichs counterclaimed

for a declaration that they owned the shop property because the arrangement was actually an equitable mortgage.

[¶14.]     A trial to the court was held in June 2005.  Myers contended that he was the fee simple owner of the shop property as evidenced by the 1999 and 2003 warranty deeds.  He further asserted that because the Eichs did not dispute his ownership when they drafted the purchase agreements in September 2004, such failure negated any claim they could now make.  Lastly, he argued that by paying $3,500 in April 2003, the Eichs entered into a one-year lease agreement with him for the shop property and were in default of that lease.

[¶15.]     The Eichs argued that the circumstances surrounding their relationship support a conclusion that an equitable mortgage existed, similar to the situation in *Adrian v. McKinnie*, 2002 SD 10, 639 NW2d 529.  Although the Eichs signed a warranty deed purporting to convey title to Myers in 1999, they insisted that the purpose was only to secure the funds Myers loaned to them.  And the 2003 warranty deeds were executed to provide Myers security for additional loans.  Moreover, the Eichs said that their $3,500 payments did not constitute an agreement to enter into a lease because they thought that this was the amount Myers wanted to receive each month.  Because they never intended to convey to Myers absolute title of their properties, and the documents surrounding the transactions evince a security arrangement, the Eichs sought a finding that an equitable mortgage existed.

[¶16.]     The circuit court entered judgment against the Eichs, ruling that certain elements established the absence of an equitable mortgage.  First, when the

Eichs executed the 2003 warranty deeds, they did so because they knew "of their delinquency and their desire not to have [Myers] foreclose on the contract for deed." Second, the March 11, 2003 letter from Myers, "clearly sets forth the lease proposal," and by paying $3,500 it was clear that the Eichs understood they were in a lease arrangement. Third, the Eichs were aware that Myers sold the home property to Mike Eich's sister and "no action was taken by them at the time to claim that [Myers] did not have title since all he had was an equitable mortgage[.]" Fourth and last, the Eichs initiated purchase agreements through counsel and "if someone else did not own the property a purchase agreement would not be necessary." Based on these considerations the court distinguished *Adrian* and entered judgment in favor of Myers for $16,306.28 in back rent on the one-year lease.

[¶17.]    The Eichs appeal, asserting that (1) "the documents comprising the 1999 transaction constitute an equitable mortgage," and (2) if the documents did not create an equitable mortgage, "was [Myers] nevertheless required to proceed by a contract for deed foreclosure action?"

## Analysis and Decision

[¶18.]    "Because the recharacterization of a document is an equitable remedy, a court has discretion to grant or deny it. Englehart v. Larson, 1997 SD 84, ¶12, 566 NW2d 152, 155. Our standard of review, therefore, is abuse of discretion." *Adrian*, 2002 SD 10, ¶9, 639 NW2d at 533. Nonetheless, "[i]f facts plainly exist to warrant equitable relief and no facts exist to disentitle a party to such relief, then a court is not free simply to ignore the remedy in the name of discretion. Consistency

and fairness require courts to decide similar cases similarly." *Id*. We review the circuit court's findings of fact under the clearly erroneous standard of review. *Id*. ¶8 n1. Conclusions of law are reviewed de novo. *Id*.

[¶19.]     The Eichs contend that the circuit court's findings of fact are clearly erroneous because "the written memorials that surrounded the transaction illustrate the parties' intent to enter into a mortgage agreement and not a sale of property." Specifically, they maintain that 1999 letter from Myers, entitled "Instructions to Borrowers," evinced an intent to create a security arrangement. The letter stated that WGMLT was "lending" the Eichs $125,000, and explained that the shop and home properties were "purchased" by WGMLT "to provide security to WGMLT for the transaction[.]"

[¶20.]     Myers, however, insists that the Eichs had no intent "to enter into a security device of any design." He claims that "[t]hey simply hoped to stay in business long enough so they might someday again own the shop property by buying it from" him. He places particular significance on the fact that the Eichs did not dispute his ownership when they had an attorney draft purchase agreements in September 2004, or when he sold the home property to Mike Eich's sister for $202,000. With this background, Myers argues that the Eichs are now precluded from asserting that an equitable mortgage exists.

[¶21.]     "Equity requires that the transaction be treated according to its substance and effect, not its form." Star Enterprise v. Thomas, 783 FSupp 1564, 1568 (DRI 1992); *see also* Brenneman Mech. & Elec., Inc. v. First Nat'l Bank of Logansport, 495 NE2d 233, 239 (IndCtApp 1986); Humble Oil & Refining Co. v.

Doerr, 303 A2d 898, 905-06 (NJSuperCtChDv 1973). A purported absolute conveyance may be recharacterized as a mortgage, depending on the surrounding circumstances and the parties' intent. *Adrian*, 2002 SD 10, ¶11, 639 NW2d at 533; Abberton v. Stephens, 747 SW2d 334, 336 (MoCtApp 1988); *Brenneman Mech. & Elec., Inc.*, 495 NE2d at 239. One who asserts that an absolute deed is in fact an equitable mortgage must establish by clear and convincing evidence that such deed was intended as security for a debt. *Adrian,* 2002 SD 10, ¶11, 639 NW2d at 533 (citing Commercial & Sav. Bank v. Cassem, 33 SD 294, 145 NW 551, 552 (1914)). Although "[o]ne of the essential elements of a mortgage is debt to be secured," whether a document was intended as security for a debt depends on the intent of the parties at the inception of the relationship. *Abberton*, 747 SW2d at 336 (examine the parties' intent when conveyance was executed); American Nat'l Bank v. Groft, 56 SD 460, 229 NW 376, 379 (1930) ("the broad rule is that whether such transaction is a sale upon a condition or a mortgage depends upon the actual intention of the parties at the time"); 59 CJS *Mortgages* §36.

[¶22.]    In this case, the circuit court found that no equitable mortgage existed, not because the Eichs failed to prove by clear and convincing evidence that the 1999 transaction was intended as a security agreement, but because of the Eichs' conduct during and after 2003. In the circuit court's view, the Eichs knew they were in default under the contract for deed and instead of insisting on proceeding through foreclosure they executed the January 2003 warranty deed. Further, the court reasoned that by paying $3,500 in response to the March 11, 2003 letter from Myers, the Eichs accepted the terms of a one-year lease agreement. Finally, the

court found determinative the fact that the Eichs failed to assert an "equitable mortgage" when Myers sold the home property to Mike Eich's sister, or when the purchase agreements were prepared in 2004.

[¶23.]     By preparing purchase agreements in response to the threat of sale from Myers in 2004, the Eichs did not necessarily jeopardize their right to seek equitable relief.  The same is also true with respect to the Eichs' failure to contest the transfer by Myers of the home property to Mike Eich's sister for $202,000.  Just as we declined in *Adrian* to read McKinnie's complaint hypertechnically, we cannot interpret the Eichs' conduct in desperation to mean that as a matter of law any claims for equitable relief were forsaken.  *See* 2002 SD 10, ¶16, 639 NW2d at 535.

[¶24.]     While the parties' conduct and relations after 1999 may be secondary considerations, it was their intent *at the inception of their relationship* that must be scrutinized to determine whether an equitable mortgage was created.  *Abberton*, 747 SW2d at 336; *American Nat'l Bank*, 56 SD 460, 229 NW at 379 ("the broad rule is that whether such transaction is a sale upon a condition or a mortgage depends on the actual intention at the time"); Pittwood v. Spokane Savings & Loan Soc., 251 P 283, 285 (Wash 1926) ("character of such transactions . . . is fixed at the time of their inception"); 59 CJS *Mortgages* §36.

[¶25.]     To ascertain the parties' intent at the inception of a transaction, we identify certain elements that, if present, favor a finding that a conveyance, absolute on its face, constitutes an equitable mortgage:

> (1) pre-existing debt not extinguished with conveyance;
> (2) conveyance made with agreement to re-convey;
> (3) property value considerably more than the debt;

(4) property in original transaction not appraised and no discussion of its value in relation to sale price; and

(5) dealings between the parties akin to that of creditor-debtor.

*See* Stava v. Stava, 383 NW2d 765, 766 (Neb 1986) (if debtor and creditor relations continue after conveyance then the transaction is a mortgage); *American Nat'l Bank*, 56 SD 460, 229 NW at 379 (strong proof that a transaction was "intended by way of sale, rather than by way of mortgage, is that a pre-existing debt was regarded and treated by the parties as extinguished or discharged by the conveyance"); *Commercial & Sav. Bank*, 33 SD 294, 145 NW at 553 ("whether a deed, absolute in form, is in fact a mortgage, the question whether the price is adequate is entitled to great weight"); Wilson v. McWilliams, 16 SD 96, 91 NW 453, 456 (1902); *see also Adrian*, 2002 SD 10, ¶11, 639 NW2d at 533; F. Gregorie & Son v. Hamlin, 257 SE2d 699, 702-07 (SC 1979); 59 CJS *Mortgages* §§36-48.

[¶26.] Based on the circumstances surrounding the original transaction and the elements tending to prove an equitable mortgage set forth above, the conveyance of the shop and home properties were in fact security for the $125,000 advanced by Myers. Their relationship did not begin because the Eichs were attempting to sell their property, but because they needed money to redeem their property. Myers, a licensed real estate broker, provided them with the necessary money and then dictated the terms of their arrangement. The Eichs agreed to his conditions. On September 1, 1999, they signed both a warranty deed and a contract for deed prepared by Myers. We recognized in *Adrian*,

> [w]here there is a deed, and contract to re-convey, and oral evidence has been introduced tending to show that the transaction was one of security, and leaving upon the mind a well-founded doubt as to the nature of the transaction, then

> courts of equity incline to construe the transaction as a mortgage.

2002 SD 10, ¶15, 639 NW2d at 535 (alteration in original) (quoting *Wilson*, 16 SD 96, 91 NW at 456 (citation omitted)); Toulouse v. Chilili Co-op Ass'n, 770 P2d 542 (NMCtApp 1989) ("[o]ne test which may be applied in determining the nature of the transaction is whether there exists mutuality and reciprocity of rights between the parties"); *F. Gregorie & Son*, 257 SE2d at 703 (essentially "the mere fact that a contract to reconvey was executed simultaneously with the deed creates in legal effect a mortgage").

[¶27.]        The fact that the conveyance and contract for deed were executed on the same day creates a strong doubt on whether this transaction was intended to be a sale.  The circumstances surrounding this case present a multitude of additional factors tending to prove an equitable mortgage.  First, there is no evidence that Myers ever planned to be the owner of the transferred property after he advanced the $125,000.  In fact, the Eichs at all times retained possession of the premises and continued to be the sole operators of the truck repair business on the shop property.  Steckelberg v. Randolph, 404 NW2d 144, 149 (Iowa 1987) (retaining possession of transferred property is "inconsistent with theory of absolute conveyance").  Second, before the transaction, no discussions were had with respect to the value of the property in relation to the consideration provided and Myers did not have the property appraised.  Instead, Myers advanced the exact amount the Eichs needed to redeem their property from First Bank of South Dakota and then charged a $10,000 fee for the transaction.  *See F. Gregorie & Son*, 257 SE2d at 703-04 (citing 59 CJS *Mortgages* §§40-41).  Third, the home and shop properties were valued at

approximately $200,000. It defies logic to conclude that the Eichs sold both properties for $125,000, and then also agreed to pay an additional $10,000 as a fee. *Pittwood*, 251 P at 286 ("where the disparity between the amount of the indebtedness and the value of the property is so great as to necessarily lead to the conclusion that the deed was intended as security, the courts will, without hesitation, so declare").

[¶28.] Further evidence that a sale was not intended is the declaration in the letter from Myers to the Eichs summarizing their arrangement. He specifically stated that the conveyance was intended to provide security for the transaction, and he did not suggest that the $125,000 was consideration for a purported sale. *Star Enterprise*, 783 FSupp at 1567 ("[a]n equitable mortgage exists where there is a manifestation that real property serve as security for the payment of a debt or obligation"); *Adrian*, 2002 SD 10, ¶11, 639 NW2d at 533 ("[o]ne of the essential elements of a mortgage is a debt to be secured") (quoting *American Nat'l Bank*, 56 SD 460, 229 NW at 379); 59 CJS *Mortgages* §41. Another strong element present in this case is that the debt was created as a result of the transaction and continued to remain after the transaction. *Adrian*, 2002 SD 10, ¶11, 639 NW2d at 533 (citing *American Nat'l Bank*, 56 SD 460, 229 NW2d at 379 (citing 41 CJ 287; *Jones on Mortgages* (8thed) §§314, 316, 318)); *Steckelberg*, 404 NW2d at 148-49; *F. Gregorie & Son*, 257 SE2d at 702-03; 59 CJS *Mortgages* §40. Finally, when a debtor and creditor relationship continues to exist after the transaction, this tends to indicate that the conveyance was intended to be security, not a sale. *Stava*, 383 NW2d at 766; *Pittwood*, 251 P at 285. Here, the debtor and creditor relationship continued

well after the conveyance. The Eichs' obligation began at $135,000, but as the amortization schedule reflects, Myers advanced them $40,098.74 in 2001 and $64,800 in 2003. After each loan, Myers recorded the transactions in a computerized amortization schedule, which then added the amount to their existing obligation.

[¶29.] Considering all the circumstances, there was strong evidence that the absolute conveyance in 1999 was intended as a security for debt, thereby creating an equitable mortgage. However, there were subsequent transactions, two warranty deeds in 2003 and a purported lease agreement, which attempted to alter the nature of the 1999 transaction. According to Myers, the 2003 warranty deeds were executed by the Eichs "because they were fully aware they were persistently delinquent in payments . . . under the 1999 contract for deed and they wanted to avoid another foreclosure and the involvement of attorneys." The Eichs, however, maintain that the new deeds were executed only to provide security for the new loans and that they never intended to convey their property to Myers or become tenants under a lease agreement.

[¶30.] What, then, is the significance of the 2003 warranty deeds and purported lease agreement, if the transaction in 1999 amounted to an equitable mortgage? It is well settled that "once a mortgage always a mortgage." *F. Gregorie & Son*, 257 SE2d at 708; *Humble Oil & Refining Co.*, 303 A2d at 905-06; Borgerding Inv. Co. v. Larson, 170 NW2d 322, 325 (Minn 1969); Hudkins v. Crim, 78 SE 1043, 1046 (WVa 1913); Tant v. Guess, 16 SE 472, 477 (SC 1892); 59A CJS *Mortgages* §1000; *see also* Meyerson v. Werner, 683 F2d 723, 729 (2dCir 1982) (Pratt, J.,

concurring in part and dissenting in part). This rule is not flexible. It has been "firmly established from an early day that when the character of a mortgage has attached at the commencement of the transaction, so that the instrument, whatever be its form, is regarded in equity as a mortgage, that character of mortgage must and will always continue." *Humble Oil & Refining Co.*, 303 A2d at 905 (citation omitted); *see also Borgerding Inv. Co.*, 170 NW2d at 325.

[¶31.] When an equitable mortgage exists, "nothing short of the actual payment of the debt, or an express release will operate as a discharge of the mortgage." *Tant*, 16 SE at 477 (citation omitted); *see also* 59A CJS *Mortgages* §1000. This right cannot be restrained or barred except by methods prescribed in law. A mortgagor's right to redeem is inseparable to a mortgage relationship. A release "will not be inferred from equivocal circumstances and loose expressions." Jolivet v. Chaves, 52 So 99, 103 (La 1910) (citations omitted). The subsequent transactions, therefore, must be closely scrutinized. *See American Nat'l Bank*, 56 SD 460, 229 NW at 379 (citing *Wilson*, 16 SD 96, 91 NW 453); *Jolivet*, 52 So at 103; *Tant*, 16 SE at 476-77.

[¶32.] The force of the doctrine of equitable mortgage cannot be avoided in this case merely because a lease agreement existed or the 2003 warranty deeds were executed by the Eichs. *Borgerding Investment Co.*, 170 NW2d at 327 (one "cannot by changing the form of the transaction cause a forfeiture of the [party's] right of redemption"); *Tant*, 16 SE at 476 ("[t]he relation of a mortgagor and mortgagee continued to exist notwithstanding the various changes in the legal title"); *see also Meyerson*, 683 F2d at 729 (Pratt, J., concurring in part and

dissenting in part) ("New York has long prevented parties to a real estate transaction from avoiding the protections due a mortgagor by disguising the nature of the transaction"). Instead, Myers had the burden of establishing that the Eichs entered into the subsequent transactions with knowledge that they released their right of redemption and that they received fair and adequate consideration for that release. *See F. Gregorie & Son*, 257 SE2d at 708; *Hudkins*, 78 SE at 1047; *Jolivet*, 52 So at 103.

[¶33.]       The record in this case does not show that Myers obtained a release from the Eichs or that the Eichs knew that by conveying their property to him in 2003 they would be waiving any right of redemption. Further evidence that a release was not obtained is that the existing debt was not extinguished after the 2003 conveyance. Instead, the record clearly reflects that after the conveyance, the Eichs continued to make payments to Myers as they had since the 1999 transaction. We place little significance on the purported lease agreement as there was nothing surrounding this transaction that provided an explicit release by the Eichs of their right of redemption. It has long ago been recognized in South Dakota that "[p]arties seeking to take an undue advantage of mortgagors situated as the plaintiff was in this case almost invariably seek to cover up the transaction by inducing the party to whom the loan was really made to take a lease of the property; hence the mere fact of leasing should have but little weight with a court of equity, which seeks to discover the real transaction." *Wilson*, 16 SD 96, 91 NW at 457; *see also Adrian*, 2002 SD 10, ¶16 n2, 639 NW2d at 535 n2.

[¶34.]       Because the circumstances surrounding the 1999 transaction created

an equitable mortgage and nothing in the record establishes that the Eichs knowingly waived their equitable right to redeem, the 2003 warranty deeds and later purported lease did not alter the form of the transaction.  Therefore, the circuit court abused its discretion when it declined the remedy of equitable mortgage.  We need not address the Eichs' second issue because our holding on the first issue is dispositive of the case.

[¶35.]     Reversed and remanded.

[¶36.]     GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.